JOHN E. GRIMES, Appellant, v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, a Corporation.—106 S. W. (2d) 462.

Division Two, June 21, 1937.

*Douglas Hudson, Louis R. Weiss* and *Mosman, Rogers, Bell & Buzard* for appellant.

*Joseph W. Jamison, Henry S. Conrad, L. E. Durham, Hale Houts* and *I. M. Lee* for respondent.

BOHLING, C.—Following a verdict of $10,000 for damages, personal injuries and property, John E. Grimes appeals from an order granting the St. Louis-San Francisco Railway Company a new trial.

The case involves a highway-railroad grade intersection accident between plaintiff's southbound automobile and one of defendant's southbound passenger trains at the intersection of Kansas State Highway No. 7 and defendant's tracks approximately one mile north of Columbus, Kansas, on November 23, 1928, about nine P. M.

The trial court sustained defendant's motion for new trial on the ground plaintiff was guilty of contributory negligence as a matter of law. Plaintiff contends, under the facts, he may not be held guilty of contributory negligence as a matter of law; conceding the propriety of the court's action under the Kansas law if he was so negligent. The following Missouri cases, among others, review the Kansas law on contributory negligence: Tate v. Missouri-K.-T. Ry. Co. (Mo.), 93 S. W. (2d) 873, 876(3); Gersman v. Atchison, T. & S. F. Ry.

Co. (Mo.), 229 S. W. 167, 169(3, 4); Woodward v. Bush, 282 Mo. 163, 174(III), 220 S. W. 839, 842(III); Bollinger v. St. Louis-S. F. Ry. Co. (Banc), 334 Mo. 720, 728, 67 S. W. (2d) 985, 989(4); Caylor v. St. Louis-S. F. Ry. Co., 332 Mo. 851, 858(3), 59 S. W. (2d) 661, 663(2, 3).

The involved physical facts [consult Tate v. Missouri-K.-T. Ry. Co. (Mo.), 93 S. W. (2d) 873, 876(2); State ex rel. Kansas City So. Ry. Co. v. Shain (Banc, June 5, 1937), 340 Mo. 1195, 105 S. W. (2d) 915], were: The highway and the railroad tracks, extending practically due north and south, converge and intersect at an acute angle. The highway is practically due north and south. The railroad track is almost due north and south, being a few degrees east of north and west of south, that is, rather northeast to southwest. Both are straight; except that a short distance north of the intersection, the highway makes a slightly perceptible swerve to the west, then, proceeding rather southeastwardly, crosses the railroad track at a greater angle than it would have had it proceeded due south, and, making another slight swerve, continues south. As we read the exhibits, this swerve (sometimes designated turn or curve) north of the intersection was considerably less than the width of the graveled portion of the highway, apparently some less than one-half the width of said pavement. Similar conditions with reference to the swerve existed south of the intersection. The distances between the center of the highway and the center of the railroad track at corresponding distances north of the center of the intersection, as ascertained by actual measurements, are: 139 feet between said center lines at a point 900 feet north of said intersection; 75 feet, 510 feet north; 60 feet, 400 feet north; 47 feet, 300 feet north; 35 feet, 200 feet north, and 22 feet, 100 feet north. From a point approximately 400 yards north of the intersection there are no obstructions to the view between said highway and the railroad track, the country being flat and rolling. Four hundred twenty-seven feet north of said intersection, at the beginning of the upward slope of the west shoulder of the highway, was the usual standard Kansas state highway sign denoting a highway-railroad intersection ahead—a metal disc, divided into quadrants by intersecting lines with the letter "R" in each of the upper quadrants. On either side of the highway was the usual highway drainage ditch. The topography of the country as disclosed by the exhibits shows the surface of the highway and the railroad tracks elevated above the surface of the intervening land, north of the intersection. A view of the west side of the railroad roadbed, rails, etc., may be had from the highway as far (and farther) north of the intersection as the "R R" sign. Like observations to one proceeding south on the highway north of the intersection are available of the railroad roadbed and intervening land immediately south of the intersection. Actual measurements show the level of

the railroad tracks to vary between 1.9 feet above the level of the highway 400 feet north of the intersection to .9 of a foot 100 feet north of the intersection. The cattle guards on the railroad north of the intersection, according to the testimony and exhibits, were approximately the length of two box cars, the tender and an engine plus 44 feet north of the center of the intersection. The railroad right of way was fenced; at the cattle guards with a plank or board "wing" fence extending west to the highway line and a like fence for several feet—the length of a plank—north along said line, and thence north with a wooden post and wire fence. Located at the beginning of the upward slope on the east shoulder of the highway and south of the intersection a distance of 60 feet, estimated was the usual railroad cross-arm crossing sign.

Plaintiff was approximately forty-seven years of age and had been a resident of the State of Kansas a number of years. He, his mother and two aunts were in his Pontiac sedan southbound on said highway from Ft. Scott, Kansas, to a hospital in Shidler, Oklahoma, to see a relative who had suffered a broken limb in an accident. Mrs. Hester Grimes, one of the aunts, and plaintiff were the only eye witnesses testifying on behalf of plaintiff. The ladies were engaged in conversation, but plaintiff was taking no part therein. Plaintiff testified the moon was shining part of the time; and that it was so he could see. Mrs. Grimes testified: "It wasn't a dark night. Q. Rather light? A. Yes, sir, it was a nice night." Plaintiff testified that his Pontiac was a new car, having been operated about one thousand miles, and the lights, which were burning, and the brakes were in good condition; that he was seated on the east side of his sedan with his window halfway or more down; that this was his first trip over that particular highway and the existence of the crossing was unkown to him; that there was nothing to bother him or distract his attention; that as he proceeded south he was traveling at a speed of 20 to 25 miles an hour, was "listening for everything," was looking to each side of the road, and "was looking for all the signs there was, watching for them all the way along, because that was a strange road;" that he observed a sign (the highway "R R" sign) north of the crossing, but he could not see what was on it; that he did not notice the "wing" fence, the railroad roadbed or track until he reached the swerve (turn or curve as he designated it) in the highway when he first noticed the railroad rails south of the intersection, about 30 or 40 feet distance; that this was so because the lights shine out ahead "quite a ways" and the intersection, the highway and the railroad being practically on the same level, was covered with gravel (the highway was a chat road) and dust; that as he made the turn he knew there was no train to the south and he looked north, saw nothing; that he didn't see and he didn't hear the train; that if the engine's headlight was burning,

he didn't see it; that he thinks it was not burning; that if it had been burning, he knows he could have seen it; that he thinks he could have seen the rays of the headlight, and because he saw no rays, "there was no headlight;" that there might have been lights in the passenger coaches; that if he saw the railroad cross-arm crossing sign south of the crossing, the accident happened so quick he forgot it; that his Pontiac did not move over ten feet after he saw the track until it was struck by the train; that he was an experienced automobile operator and could, under the existing conditions, stop his Pontiac in a distance of ten to twenty feet; that he observed an automobile following him, the occupants of which testified they were about a quarter of a mile north of plaintiff's car at the time of the impact. Mrs. Grimes' testimony adds nothing of value to plaintiff's.

Defendant's evidence, briefly put, adduced, among others, from occupants of two other automobiles at the scene, was to the effect, among other things, that the train was traveling between 40 and 50 miles an hour, with its headlight and the lights in the coaches burning and plainly visible from the highway, and with its whistle sounding. The moon was in the first quarter, fading to the full moon.

Plaintiff to sustain his contention that he was not contributorily negligent as a matter of law stresses the cases of Harwood v. Missouri P. Railroad Co., 118 Kan. 332, 334, 335, 234 Pac. 990, 991, 992; Chicago, R. I. & P. Ry. Co. v. Hansen, 78 Kan. 278, 281, 283, 96 Pac. 668, 669, and Agee v. Missouri P. Railroad Co. (Mo. App.), 288 S. W. 992, 994(2).

Plaintiff asserts the Harwood case is a "grey mule" authority, and that he has no case which states the law applicable here with greater clearness, cogency and certainty. In that case the Kansas Supreme Court sustained a judgment in favor of Harwood, who was struck and injured by a train at an approximately right angle highway-railroad grade intersection. Harwood "was a stranger and did not know where the crossing was;" "while he was keeping a lookout ahead he did not see the track or rails and was unaware of the presence of the railroad until he was upon it;" the day was misty and a slight rain was falling;" "the mud, weeds and absence of a crossing sign prevented him from discovering the railroad in time to have avoided the accident." The court said: "The defendant rightly contends that a traveler who sees a railroad track is already warned of danger, and that if a view of the road is obscured it is incumbent on him to stop, look and listen before going upon the crossing, and where a view cannot be otherwise obtained he is required to take the added precaution to go to a place where a view of the track may be had, and that a failure to take these necessary precautions is such negligence as bars a recovery. These rules . . . are well established

by the authorities, but they can only be applied where the railroad track is visible or known to the traveler. . . . It is the duty of the driver of an automobile to keep a lookout ahead for possible dangers, and if he does so he will ordinarily see a railroad track which passes across a highway. . . . Everyone is required to use his faculties to discover a visible danger. . . . There would be good grounds for the contentions of defendant if the plaintiff had seen the track or had known that he was approaching a crossing. The authorities cited apply to a traveler who fails to look or listen when he is approaching a railroad, the existence of which he knows or *has had the warning which the track itself affords* and fails to take precautions for his own safety. These rules, as we have seen, do not apply where the crossing is not visible to the traveler and he is not aware of its existence." (Italics ours.) The Hansen case involved a hore-drawn wagon. The accident occurred about 8 P. M. on a dark night. The highway was on a steep decline at the highway-railroad intersection and the issue passed off on the duty of the traveler to stop and listen at the crest of the hill, 245 feet from the track, just before entering a cut which precluded a view of the approaching train. The court was unable to concur in defendant's contention that "deceased was guilty of contributory negligence by failing to look and listen when at the crest of the hill;" and, considering the darkness and absence of some knowledge on the part of deceased of the dangers to be avoided, stated: "he was not aware that he could not thereafter see down the railroad track to the southeast until he was too close to the crossing to protect himself from a train coming from that direction." The decision makes no mention of any railroad cross-arm crossing sign and, of course, an automobile with headlights burning was not involved. Woodward v. Bush, 282 Mo. 163, 176, 220 S. W. 839, 843, quotes Williams v. Railway, 102 Kan. 268, 271, 170 Pac. 397, 399, announcing the policy of a more rigid application of the rule touching the duty of self-preservation imposed upon those about to cross a railroad track in a motor vehicle. The Agee case also involved a Kansas highway-railroad crossing accident, suffered by a stranger to the crossing when it was raining hard on a dark and foggy night. The rays of the locomotive's headlight, as well as the headlights of the automobile, operating off of a magneto, were materially obstructed by the existing conditions. The court considered, under the evidence most favorable to plaintiff, that the headlights of his automobile permitted him to see conditions for a distance of only 100 feet and that a railroad cross-arm sign 84 feet from the intersection on the opposite side to plaintiff and cattle guards 120 feet to the side of the paving afforded no sufficient warning of the existence of the grade intersection, evidently otherwise unascertainable until too late. The court followed the rule announced in the Harwood and Hansen cases, supra, to the effect that where

"there is nothing at the place to indicate the presence of a railroad track or a warning of the existence of danger unknown to him [a traveler], there is no application of the rule of stop, look and listen." The facts of these cases differentiate them from the instant case.

Heinen v. Atchison, T. & S. F. Ry. Co., 125 Kan. 612, 615, 616, 266 Pac. 35, 37, holds: "A person driving in an automobile along a public highway at a speed of 30 to 35 miles an hour, who does not use any precaution to ascertain whether a railroad track is ahead of him when a crossing sign can be seen, and parts of the railroad track can be seen at a distance from the track sufficient to enable him to stop his car, is guilty of such negligence as prevents his recovery." It explains the Harwood case, supra: "In that case there was no crossing sign, and the track was hidden by mud, grass and weeds on the right of way." The Kansas courts consider a railroad cross-arm crossing sign sufficient as a matter of law to charge the occupants of an automobile with knowledge that they are approaching a railroad track, and a failure to see and heed such warning, when visible, contributory negligence barring recovery [Coleman v. St. Louis-S. F. Ry. Co., 130 Kan. 325, 331, 286 Pac. 254, 257; Cooper v. Chicago, R. I. & P. Ry. Co., 117 Kan. 703, 711, 232 Pac. 1024, 1028(4)].

In the instant case, the night was not dark, rather light, and plaintiff could see. There was no mist, rain or fog. Plaintiff, an experienced driver, was traveling over a strange road, was on the alert, with his window halfway or more down, was listening for everything, watching for all signs, and looking to each side of the highway. The headlights of his Pontiac were in good condition, yet he testified he did not see the railroad track until within 30 or 40 feet of it. If so, either he was not as alert as his testimony would indicate or his headlights were not in good condition. If the headlights revealed objects for a distance of only 30 or 40 feet, he was negligent in operating his automobile at a speed of 20 to 25 miles an hour. It is a matter of common knowledge that the light rays from an automobile headlight diverge and illuminate not only the road ahead but to the side for a considerable distance. If they did not the operation of motor vehicles at night would be a menace to the public and afford the operator only limited opportunity to avoid injuring others or to protect himself. Plaintiff passed within a few feet of and saw the highway "R R" sign, of some significance, but did not give it sufficient heed to ascertain what was on it notwithstanding he was watching for all signs; and we are at some loss to account for his failure to observe the railroad cross-arm sign as, from the physical facts, the swerve in the highway was not sufficient to cause it to be without the rays of his automobile headlights if in good condition. The intersection, the condition of which is stressed

by plaintiff, was not the only warning of the existence of a converging railroad track as plaintiff proceeded south. The "wing" fence, marking the location of the cattle guards, was 100 feet or more north of the intersection. It and the railroad cross-arm sign were painted white to reflect, not absorb, the light rays. The railroad and the highway were not separated by any fence from the cattle guards south of the intersection and beyond. Two hundred feet north of the intersection, the center of the railroad track was but 35 feet from the center of the highway over which plaintiff was traveling; 100 feet north, it was but 22 feet, converging toward the highway up to the point of intersection. We think the "wing" fence, the cessation of fencing at the cattle guards, and converging railroad, elevated above the surrounding terrain and free from weeds and grass, north of the intersection, under the conditions disclosed by this record, observable to an automobile traveler exercising ordinary care while approaching the intersection from the north. If observable, they constituted a warning of the existence of a railroad and the nearness of an intersection with the highway. Under the Kansas cases, plaintiff, an experienced and capable operator of motor vehicles, had ample warning to permit of his stopping, looking and listening. The converging railroad track and slight swerve in the highway, observable ahead, gave notice of the nearness of the crossing. His failure to observe the physical facts shows he was off his guard. When he was 100 feet north of the intersection, defendant's train was within 200 to 300 feet of the intersection, and well within view, and maintained, under the evidence, a corresponding position as plaintiff neared the intersection. It was observed and heard by all parties traveling the highway who testified other than plaintiff and Mrs. Grimes. "The fact that the plaintiff would have been obliged to turn in his seat and look backward is of no consequence." [Reader v. Atchison, T. & S. F. Ry. Co., 112 Kan. 402, 404, 210 Pac. 1112, 1113.] His testimony that, when within ten feet of the intersection, he looked north and saw nothing, the train being within twenty to thirty feet north of the intersection, also establishes his lack of ordinary care in the use of his ocular faculties. The facts bring the case within the Kansas cases (cited supra or mentioned in the Missouri cases first cited) ruling that the contributory negligence of a plaintiff precludes his recovery notwithstanding the negligence of the defendant.

The order of the circuit court is affirmed and the cause is remanded. *Cooley* and *Westhues, CC.,* concur.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the court. All the judges concur.