No. 28,965.

W. L. COLEMAN et al., *Appellees,* v. THE ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, *Appellant.*

(286 Pac. 254.)

Opinion filed April 5, 1930.

*E. T. Miller,* of St. Louis, Mo., *Henry S. Conrad, L. E. Durham* and *Hale Houts,* all of Kansas City, Mo., for the appellant.

*David F. Carson,* of Kansas City, and *Ralph Page,* of Ottawa, for the appellees.

The opinion of the court was delivered by

JOCHEMS, J.: The appellees, W. L. Coleman and Elizabeth Coleman, sued the St. Louis-San Francisco Railway Company in the district court of Wyandotte county for damages for the death of their unmarried son, James Clarkson Coleman. He was killed on September 21, 1924, in a collision upon a highway grade crossing near Paola, Kan. An automobile in which he was riding at the time collided with a passenger train of the defendant. Plaintiffs

asked for damages in the amount of $3,000 and obtained a verdict from the jury for the full amount. Judgment was so entered on the verdict, and defendant appeals.

We will consider the first question raised by appellant in its brief, in which appellant contends that demurrer to plaintiffs' evidence should have been sustained, and that under the evidence and the special findings of the jury the defendant was chargeable with no negligence proximately causing the death of the deceased, and that as a matter of law the sole proximate cause of his death was the negligence of the driver of the car, or the negligence of the driver and of the deceased; that even had there been negligence on the part of the defendant recovery would be barred by the negligence of the deceased.

The railroad crossing in question was about fifteen rods outside the corporate limits of Paola. The defendant's tracks ran from the southeast to the northwest, the direction being generally designated in the briefs as north and south. The highway in question was the main traveled road between Osawatomie and Paola, a distance of some ten miles. The highway ran from the south to a point some 500 feet west of the crossing, where it turned directly east, continuing in an easterly direction, crossing the tracks at the point where the collision occurred and running thence to a point 100 feet or more beyond, where it intersected Silver street extended from the city of Paola. The car in which the deceased and his companions were riding was eastbound, having come from the south and made the turn to the east. Lying south of the highway from the point where the turn was made to go east, to the west edge of the right of way, was the property of T. W. Hayes. About halfway between the corner where the road turns to the east and the right of way was the Hayes house. East of the house, but west of the right of way, were the shed and barn. Defendant's west right-of-way line was 50 feet from the center of the tracks. About 110 feet west of the center of the track a driveway entered the Hayes property from the road. Between the driveway and the edge of the right of way, along the south side of the road as it approached the tracks, there was a hedge fence, and along the west side of the right of way for some distance south and running along the east line of the Hayes property on the line between that property and the right of way, there was also a hedge fence which encroached about one foot on the right of way.

On the Hayes property between the buildings and the hedge there were some trees.

The deceased and his companions had come from Garnett, some thirty miles beyond Osawatomie and about forty miles from Paola. Two other automobiles were traveling in the same direction. The occupants had been to a ball game at Parker. A Mr. Scheinert owned and drove the first car and a Mr. Ingle the second car. The Scheinert car crossed the track and stopped about 60 to 75 feet east thereof just before the deceased and his companions drove on the track. Scheinert stopped to wait for the car being driven by Ingle because his small son was in the Ingle car and he wanted to see if they got across safely. Scheinert and the occupants of his car saw the train as they came up to the track and one of the occupants wanted him to wait until the train had passed, but he drove on across. Defendant's track was built up on a grade some 10 or 12 feet above the level of the ground and the highway was inclined upward as it approached the track from either side. About 500 feet south of the crossing where the collision occurred was another road, crossing the track from the west, which turned in a northerly direction and ran along the east side of the track and connected with the road upon which the collision occurred, and with Silver street just east of the crossing which was the scene of the collision.

The car in which the deceased was riding was a Dodge, driven by a young man named Grenen. The driver, the deceased and another young man were the occupants, and all were riding in the front seat. This Dodge car had passed the Ingle car about two miles from Paola and was traveling very fast at the time, according to the occupants of the Ingle car. The occupants of the Scheinert car saw the collision after they had crossed the track and had stopped to wait for the Ingle car. The first glimpse they had of the Dodge car driven by Grenen was as it came up to the track from the other side. Grenen, the driver, lived about three hours after the collision. The deceased and the other young man were killed instantly. The pilot of the engine struck the middle of the car and the occupants landed on the east side of the track. The speed of the train was variously estimated by witnesses at from 35 to 55 miles per hour. There was no evidence as to the speed of the automobile driven by Grenen offered on behalf of the plaintiffs, except that some of the witnesses in the Scheinert car stated that it seemed to

"come right up out of the ground" on the west side of the track. One witness for the defendant, Mrs. Hayes, estimated the speed of the Dodge car, as it passed her house and went upon the track, at from 40 to 45 miles per hour. The road was a dirt road and rough. One witness for plaintiffs testified that it was so rough as it approached the track that "if you drove 15 or 20 miles per hour you were liable to be bounced out of the car."

There was a pronounced incline beginning about 20 or 30 feet west of the railroad track, according to some witnesses. Others claimed that the incline was gradual. Some claimed it was gradual up to a point 20 or 30 feet west of the track and then came right up by a sharp incline to the railroad track. Scheinert testified he heard the train whistle when he got on the track. He stated that from the time he saw the train until it struck the Dodge car it seemed a very short while. The evidence on the part of all witnesses who were in a position to hear was to the effect that the train whistled for the crossing. There was testimony that shortly after the collision the cattle guard, which was broken as a result of the collision, and the railroad crossing sign, were repaired and repainted.

There was testimony showing there was a hedge fence along the west right-of-way line, and also from the driveway into the Hayes farm up to the right of way. Other testimony was that there were some trees on the Hayes property which obstructed the view; that the foliage was still green and pretty thick. There was conflicting testimony as to the height of the hedges. Some witnesses stated that they were 10 to 12 feet high at the time of the accident; others who testified for the defendant stated that they had been cut down several weeks before the collision and were then in the condition as shown by certain photographs which defendant took the morning after the collision. The testimony was clear and undisputed that the hedge fence to the west of the track was on the line between the right of way and the Hayes property; that this line was 50 feet from the track, but that the hedge encroached about one foot over on the right of way, thus leaving a space of 49 feet between the track and the hedge clear of any and all obstructions. There was some testimony that the train could not be seen by the deceased on account of the obstructions above described, and shadows. The collision occurred in the early evening. Some witnesses testified that it was about 6:45 p. m. The engineer stated that it was exactly 6:15 p. m. The headlight on the train

had not been turned on; neither were any of the automobiles using their headlights.

The jury made special findings as follows:

"1. Did the car in which deceased was in stop on the highway west of the crossing, and if so, how far from the track? A. We presume the car did stop about 50 feet.

"2. How fast was the car, which deceased was in, going when it went upon the crossing? A. From 10 to 15 miles per hour.

"3. How fast was the car, which deceased was in, going when it passed the Hayes house? A. About 20 miles per hour.

"4. How fast was the car, which deceased was in, going when it turned east on the highway at the turn west of the Hayes house? A. About 20 miles per hour.

"5. How far south of the crossing could a train be seen from the highway at the following points?

(a) From 100 feet west of the track? A. Couldn't see it.

(b) From 75 feet west of the track? A. Couldn't see it.

(c) From 50 feet west of the track? A. Couldn't see it.

(d) From 40 feet west of the track? A. About 10 feet.

(e) From 30 feet west of the track? A. About 25 feet.

(f) From 15 feet west of the track? A. About 50 feet.

(g) From 10 feet west of the track? A. About 100 feet.

"6. Was there any obstruction to the view south on the railroad track from the highway approaching the crossing from the west? A. Yes.

"7. If in answering the last question you have said there was obstruction to the view south of the track, state:

(a) What were the obstruction or obstructions? A. Trees, hedges and shadows.

(b) Where were they located? A. The hedge and trees were 49 feet west of the track. The shadows extended across the tracks.

(c) How far from the track? A. 49 feet.·

"8. Was the collision caused by any negligence on the part of the defendant railroad company? A. Yes.

"9. If you answer that the accident was caused by some negligence on the part of the defendant, state what that negligence was. A. The train was traveling at a high rate of speed across a public highway. The fireman was not watching for the crossing. Lack of proper signals. Obstructions along right of way."

Does the record show any actionable negligence on the part of the defendant? We will consider in their order the various grounds of negligence found by the jury in its answers to special question No. 9.

First: The jury found that the train was traveling at a high rate of speed across a public highway. In the recent case of *Cross v. Chicago, R. I. & P. Rly. Co.*, 120 Kan. 58, 242 Pac. 469, the court

quotes with approval from a former decision (*A. T. & S. F. Rld. Co. v. Hague,* 54 Kan. 284, 38 Pac. 257) as follows:

"Cases may arise where the speed of a train may be considered by a jury, in connection with the location and other surrounding circumstances, upon a question of negligence. In densely populated districts, such as towns and cities, public safety requires the speed to be moderated. This crossing, as we have seen, however, was in the country, where there was no statutory or municipal regulation with respect to the speed of trains. In such cases there is no limit upon the speed at which trains may be run, except that of a careful regard for the safety of trains and passengers." (p. 60.)

Under the facts, as shown by the record in this case, the speed at which the train was running did not constitute negligence.

Second: The jury found that "the fireman was not watching for the crossing." This was not in and of itself negligence. The fireman's duties are numerous. He has other duties in the operation of a train besides that of sitting at the window and constantly watching for railroad crossings. Likewise it is clear under the evidence in this case that had he been watching for the crossing there was nothing he could have done to prevent the collision. It must be remembered that had the fireman been watching the crossing the train could have been seen by the driver of the automobile and the deceased as soon as the fireman could have seen the automobile. At the rate of speed at which the train was traveling, had the fireman been keeping a constant lookout, there is no reason to find that he could have averted the collision.

Third: The jury found "lack of proper signals." The specification by the jury of particular grounds for negligence in finding No. 9, and the failure of the jury to include a lack of proper crossing sign as a ground of negligence, constituted a finding for the defendant on this point. (*Roberts v. Railway Co.,* 98 Kan. 705, 161 Pac. 590; *Cooper v. Railway Co.,* 117 Kan. 703, 232 Pac. 1024; *Morlan v. Atchison, T. & S. F. Rly. Co.,* 118 Kan. 713, 236 Pac. 821.)

The appellees contend that the finding of the jury "lack of proper signals" refers to and includes failure to have a proper crossing sign. Upon the question of whether or not a proper crossing sign was maintained, there was considerable evidence and that point was strongly contended on the trial. So much so that the jury could not have failed to have had in mind, as one of the points of negligence, the plaintiffs' specific contention about the sign. The testimony relative to the crossing sign was given by the witness Scheinert. He was asked about the crossing sign and stated:

"There was one on the east side of the track southeast of the crossing; it was not visible to a person coming from the west *if there was a train on the crossing.*"

The witness meant, of course, that when a train was in the act of crossing the point where the highway intersected the railroad track it would necessarily be between the crossing sign and a party coming from the west on the highway. Under that situation, of course, the crossing sign could not be seen. It is our interpretation of the jury's special finding "lack of proper signals" that the jury did not mean to include the failure to maintain a crossing sign. In fact, there was positive evidence showing that the usual crossing sign was maintained at the crossing and that it was visible for some distance before coming to the crossing.

The word "signal" is defined in Webster's International Dictionary as follows:

"(2) A sign made to give notice of something, as of a command or danger, as, a *signal* to fire.

"(3) A sign, event, or watchword which has been agreed upon as the occasion of concerted action. That which incites to action; an initial cause or impulse."

The word "sign" has a number of meanings, but is defined in the same work under subdivision 7:

"A lettered board, or other conspicuous notice, placed on or before a building, room, shop or office to advertise the business there transacted, or the name of the person or firm there conducting it; a publicly displayed token or notice."

The common understanding of the word "signal" as used in connection with the operation of a railroad is one which implies action— the doing of some act whereby notice or warning is given, such as the ringing of a bell, blowing a whistle, waving a lantern, or shooting a torpedo. On the other hand, the word "sign," as commonly understood when used in connection with a railroad crossing, means an inanimate, inactive object, such as a board upon which words of warning are painted.

The crossing sign was sufficient as a matter of law to have charged the occupants of the car with knowledge that they were approaching a railroad track. (*Heinen v. Atchison, T. & S. F. Rly. Co.,* 125 Kan. 612, 266 Pac. 35.) It appears, therefore, that a crossing sign which complied with the requirements of the law was properly maintained.

The finding of the jury "lack of proper signals" narrows down, then, to one thing—failure to sound the whistle. That is the only

lack of signal which the jury could properly have had in mind. But the testimony of all witnesses who were in a position to hear was that the whistle was blown. The testimony on this point is so clear that when the finding of the jury is narrowed down to a failure to sound the whistle, it is unsupported by the evidence. The record, therefore, does not establish any negligence on the part of the defendant by reason of failure to blow the whistle.

Fourth: The jury found as a ground of negligence "obstructions along right of way." In support of this finding of the jury the appellees cite the following cases: *Corley v. Railway Co.*, 90 Kan. 70, 133 Pac. 555; *Smith v. Street Railway Co.*, 91 Kan. 31, 136 Pac. 930; *Burzio v. Railway Co.*, 102 Kan. 287, 171 Pac. 351; *Schaefer v. Interurban Railway Co.*, 104 Kan. 394, 179 Pac. 323.

However, in each of those cases it must be observed that recovery was permitted because the obstructions were negligently permitted by the railroad company to exist on its right of way, while in the instant case the obstructions of which complaint is made were on the land adjoining the right of way. They were not maintained or permitted by the railway company on its own right of way, as in the cases cited by appellees. The obstructions complained of were hedge fences and trees, but the evidence is clear and undisputed that none of the trees were permitted on the right of way, and the hedge fences were on the property line between the right of way and the property of the adjoining owner. From a point 49 feet west of the track the view of the track and right of way was clear of any obstructions. Under these conditions, the obstructions, if any, being on the adjoining property, were not negligently maintained by the railroad company and it could not have been liable for obstructions maintained by the owner of the adjoining property.

In finding No. 7 the jury also found that "shadows extended across the tracks." These shadows, if any, were caused by the fact that the sun either had gone down or was about to go down, and the obstructions complained of, namely, the trees and the hedge, were between the sun and the railroad track, and this caused shadows to fall from the alleged obstructions, extending across the railroad tracks, thereby shutting off the view of the deceased and the driver. If, as we have seen, the railroad company was not guilty of any negligence in maintaining the obstructions, it manifestly follows that it could not have been liable for the shadows thrown across

its tracks because of obstructions on adjoining property which it did not maintain. The shadows were not the result of any act of negligence on the part of the railroad company.

We therefore conclude, from an examination of the record in this case, that no actionable negligence on the part of the railroad company is disclosed. The judgment is therefore reversed and remanded with instructions to the trial court to enter judgment for the defendant.