No. 45,581

JAMES E. (JACK) WILLIAMS, *Appellee,* v. UNION PACIFIC RAILROAD COMPANY, a CORPORATION, *Appellant,* Consolidated with: FARMLAND INDUSTRIES, INC., *Appellee,* v. UNION PACIFIC RAILROAD COMPANY, a CORPORATION, *Appellant.*

(465 P. 2d 975)

Opinion filed March 7, 1970.

*Charles N. Henson,* of Lillard, Eidson, Lewis & Porter, of Topeka, argued the cause and *Edward M. Boddington, Sr.,* of Boddington, Boddington & Brown,.of Kansas City, was with him on the brief for appellant.

*James D. Howell, Jr.,* of Overland Park, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by

FROMME, J.: Two separate claims were consolidated and tried to a jury in the district court. Judgments were entered against the defendant on separate verdicts and the defendant appeals. The claims arose from a collision between a switch engine and a gasoline transport truck in the Fairfax industrial district of Kansas City, Kansas.

James E. Williams (the driver of the gasoline transport truck) recovered judgment for personal injuries against the Union Pacific Railroad Company, a corporation, (the railroad) in the sum of $9,975. Farmland Industries, Inc., (the owner of the truck) recovered judgment for damages to the truck in the sum of $2,392.80.

The railroad-appellant has limited its points relied upon to three. It contends, (1) There is no substantial evidence of negligence by the railroad, (2) The evidence conclusively shows the driver of the transport was guilty of negligence which was the direct cause of the injuries and damage, and (3) The trial court admitted irrelevant and prejudicial testimony over objection.

The collision was between a 230,000 pound switch engine and a gasoline transport tractor-trailer in the dark early morning hours of October 12, 1966. The city streets are intersected in this industrial district by various railroad tracks which serve many industrial plants in the area. Loading and unloading operations are carried on by the railroad in what is referred to as a "yard operation", as distinguished from a higher speed "road operation". The collision occurred where the railroad tracks cross Stanley Road approximately 300 feet east of the intersection of Stanley Road and Seventh street. This is about a block and a half west of the Kansas port of entry located at 440 Stanley Road.

The switch engine was being operated by a crew of four men. It had left the Phipps building, which is southeast of this street crossing and was destined for the Buick, Oldsmobile and Pontiac plant which is in a northwesterly direction. Before reaching the crossing the tracks curve and pass near the east side of the Industrial Lumber Company building. The view of traffic to the west is obstructed at this point by the lumber company building and by a pile of lumber stacked to the north of the building. There were no official traffic control signs on Stanley Road at this crossing.

There was no railroad crossing sign to alert traffic from the west to the presence of the tracks.

The locomotive engineer testified at the trial that he started the switch engine at the Phipps building and applied air to go four or five miles per hour. He started the bell and gave the crossing warnings. He could see clearly a hundred yards but as he rounded the curve he lost sight of the crossing. From his position at the controls he was unable to see the street to the left or to the west and had to rely on crew members for a look out. He received an emergency stop signal from a crewman when the engine was thirty-seven feet from the crossing. He engaged the emergency brake. He saw a flash of the transport truck ahead of his engine prior to the collision. He reported his speed at the time of the collision as four miles per hour.

One member of the crew, a switchman, was seated in the cab of the switch engine and saw nothing. The engine foreman was standing outside and on the left front deck plate of the switch engine. He saw the truck approaching from the west when the switch engine was fifty feet from the crossing. It was not his duty to flag traffic but from his position on the front of the engine he attempted to signal the truck with his lantern. When the engine was ten or fifteen feet from the crossing he jumped from the engine and ran toward the Industrial Lumber Company building.

The fourth member of the crew, the "pin-puller", was riding outside and on the right front corner of the engine. It was his duty to flag crossings, work switches, and keep in touch with the engineer by lantern signals so the engineer could properly control the engine. He saw the truck turn onto Stanley Road some 300 feet west of the crossing. He gave no sign to the engineer of the approach of the truck until he determined the truck was not going to stop. When the switch engine was forty feet from the street he gave an emergency stop signal to the engineer and then jumped and ran to the southeast away from the engine.

The driver of the transport truck testified at the trial that at 4:30 that morning he went to the truck terminal in Kansas City to pick up his orders. He was ordered to pick up a load of gasoline at Williams Brothers Pipeline in the Fairfax industrial area and transport it to Trenton, Missouri. He was proceeding to the pipeline loading dock and had turned onto Stanley Road at Seventh Street, traveling east toward the loading zone. The weather was clear,

the street was dry and it was dark in that area. There were no street lights. He had traveled this route about every two weeks and had never seen a switch engine operating in the area. He had the truck lights on. The headlights were on dim. He did not see the switch engine. He saw no warning lights and heard no bell or sound from the switch engine. He slowed to ten miles per hour, and proceeded to cross the tracks. When he was practically across the double tracks he felt an impact. He heard a crash and his head went through the windshield.

A detective working for the city investigated the accident shortly after it occurred. When he arrived he could not determine whether any light was burning on the switch engine. There were no street lights in the area. There were no traffic control devices used at this crossing. He determined the two vehicles came together about three or four feet north of the south side of Stanley Road. The front coupler on the switch engine came in contact with the right rear dual wheels of the transport. There was also a dent in the tank a few feet ahead of the damaged rear wheels. The truck had been shoved north from the eastbound to the westbound lane of traffic on Stanley Road. He was informed by the engineer that the maximum rate of speed for the switch engine under the operating rules of the railroad was ten miles per hour. It was traveling about four miles per hour. The speed limit on Stanley Road at this point was thirty miles per hour. The truck driver estimated his speed as he crossed the tracks at ten miles per hour.

There was conflicting testimony as to the distance required to stop a switch engine traveling at a walking speed of from four to five miles per hour. The testimony as to stopping distances varied from less than ten feet to as many as fifty-four feet.

The "pin-puller" testified he flashed the emergency stop signal to the engineer when the switch engine was forty feet from the crossing. The engineer testified he saw this signal when the engine was approximately thirty-seven feet from the crossing and he immediately applied the brakes. The switch engine traveled forty feet before hitting the truck.

There was testimony from an inspector at the port of entry that switch engines operating over this crossing at night, did not use lights or sound any warning whistle or bell, and the railroad did not use a flagman at the crossing. He had worked at the port of entry for five years. Two police officers who patrolled this area

four or five times every evening had observed the switch engines in operation over this crossing at various times. They testified the engines were operated without lights and no crew member got off to flag that particular crossing except during the daytime when traffic was heavy. None of these witnesses were present when the accident occurred on October 12, 1966.

The appellant railroad first contends there was no evidence that it was guilty of negligence which was a direct and proximate cause of the accident.

The railroad argues that under the case law in Kansas railroad trains have the right of way at railroad crossings and because of the character and momentum of such trains they cannot be expected to stop and give precedence to an approaching traveler. The cases cited by appellant in support of this rule arise from crossing accidents involving high speed trains operating in what may be called a road operation as distinguished from a switching operation in the yards. ( See *Vance v. Union Pac. Rld. Co.,* 133 Kan. 11, 298 Pac. 764; *Ross v. Chicago, R. I. & P. Rly. Co.,* 165 Kan. 279, 194 P. 2d 491; *Horton v. Atchison, T. & S. F. Rly. Co.,* 161 Kan. 403, 168 P. 2d 928. )

The rationale of those cases when applied to road operations of a railroad appears reasonable and just but we do not believe such a rule of precedence should preclude recovery against the railroad when it is operating a switch engine in a yard operation under the facts of this case.

Other cases relied on by the railroad relate to accidents where trains were occupying railroad crossings. ( See *Jones v. Atchison, T. & S. F. Rly. Co.,* 129 Kan. 314, 282 Pac. 593, and *Grisamore, Administratrix v. Atchison T. & S. F. Rly. Co.,* 195 Kan. 16, 403 P. 2d 93. )

These cases preclude recovery against the railroad under the rule that a driver must keep his vehicle under control so as to be able to stop within the range of his vision. When the driver fails to see a train which is occupying the crossing and runs into it, the contributory negligence of the driver precludes recovery regardless of negligence on the part of the railroad.

Applicable rules for determining questions relating to the negligence of a railroad and the contributory negligence of a driver of a vehicle at a city street crossing were discussed in *Grisamore, Ad-*

*ministratrix v. Atchison, T. & S. F. Rly. Co.,* supra. In *Grisamore* it was stated:

". . . The duty of a railroad to a motorist approaching a crossing is directly affected by the care required of the motorist. If the motorist would have been able to see the hazard had he looked and been able to avoid the collision had his automobile been in proper condition and under proper control, the railroad has no obligation which could result in its negligence." (p. 19)

. . . . . . . . . . . . . . .

"Although railroads are not insurers of the safety of persons approaching their tracks for the purpose of crossing, they must exercise due care for the safety of travelers at public crossings. This anticipates the exercise of ordinary care depending on the situation and surroundings at the crossing. Unusual dangerous conditions prevailing at the crossing may require the railroad to anticipate that the mere presence of the train standing thereon will not adequately warn users of the highway. Such special conditions may create an unusual hazard making additional warnings necessary." (p. 20)

After reviewing many of the railroad crossing cases the court in *Grisamore* went on to say:

"It would appear from the foregoing cases that where a crossing is unusually hazardous the question of whether a driver of a motor vehicle is guilty of contributory negligence is a question of fact if the rays from the headlights are absorbed by the color of a standing railroad car; if there is a blending of the train with the street or general background; if the vision of the motorist approaching the crossing is affected by street lights near the crossing or on opposite side of crossing, or where the railroad car was on a grade so that the light beams projected under and past standing cars." (pp. 22, 23)

The court concluded in *Grisamore* that a plaintiff in a street crossing accident must establish that the surrounding conditions rendered the crossing more than ordinarily dangerous if recovery was to be had; and, whether the crossing was more than ordinarily dangerous is generally a question of fact which plaintiff must establish by his evidence.

Unusually dangerous conditions prevailing at a crossing in an industrial area of a city may require a railroad company engaged in switching operations to anticipate that the mere presence of a switch engine as it approaches the crossing will not adequately warn motorists using the street, and the unusual hazard may make additional warnings and precautions by the railroad company necessary.

In considering the sufficiency of the evidence on appeal only the evidence favorable to the prevailing party below is to be con-

sidered. (See 1 Hatcher's Kansas Digest [Rev. Ed.] Appeal and Error § 496.)

What were the conditions in this case which would render the crossing more than ordinarily dangerous? The crossing was located in an industrial area. It crossed a city street which had no warning signs or traffic control and where the speed limit was thirty miles per hour. There were no street lights in the area. The switch engine was proceeding at a walking speed and not readily discernible to a motorist on a dark night. The motorist was approaching these tracks on Stanley Road from the west with the truck headlights on dim. He looked and nothing was apparent to him in the road ahead to warn of the slow approach of the switch engine from the south. The presence of the engine was obscured from the driver's vision by darkness, by a building and a pile of lumber in close proximity to the crossing and by a sign to the right of the roadway advertising the Industrial Lumber Company. In addition the switch engine was slowly moving against a backdrop of the Phipps building which had a spot light shining from the roof. Under the circumstances attending, the crossing was more than ordinarily dangerous.

What evidence was there that the railroad failed to take adequate precautions for the safety of motorists using this crossing?

No member of the crew on the switch engine got off to flag the crossing. They saw the truck approaching from a distance of over 300 feet. The switch engine could have been brought to a stop within less than ten feet if proper procedures had been used by the crew. The engineer was notified by the "pin-puller" to make an emergency stop when the engine was forty feet from the street. The switch engine continued on without slacking its speed until it hit the rear dual wheels of the truck. The engine traveled approximaterly forty-five feet before hitting the truck and its momentum carried it another six feet after impact.

We have no difficulty in finding a basis in the evidence for the jury's holding that defendant was guilty of negligence which was a direct cause of the collision.

Appellant contends the plaintiff was guilty of contributory negligence as a matter of law for failing to stop, look and listen before attempting to cross the railroad tracks. What has been previously said concerning the dangerous nature of this crossing and the attending circumstances disposes of all features of this argument ex-

cept one. Appellant insists it was error for the trial court to include the provisions of K. S. A. 8-566 in the instructions given to the jury, and it argues that the failure of the truck driver to stop his truck before crossing the tracks was negligence as a matter of law.

K. S. A. 8-566 (a) provides that a driver of a motor vehicle designed and used to carry flammable liquids shall stop, look and listen and not proceed until he can safely do so, except as provided under (b) and (c) of this section. It is provided in (b) that no stop need be made where a police officer or a railroad signal controls such crossing, and it is stated in (c) "This section shall not apply at street railway grade crossings within a business or residence district."

Error in including the statute in the instructions cannot be considered by this court for two reasons. First, the appellant did not include the court's instructions in the record. It has long been the rule that error cannot be predicated upon the giving of a particular instruction when the instructions are not included in the record on appeal. (See 1 Hatcher's Kansas Digest [Rev. Ed.], Appeal and Error § 235.) Secondly, we note the appellant made no objection to the instruction when the same was given by the trial court. Since the instruction quoted the full text of a statute which is admittedly germane to the issues of the case and since it was unobjected to by the appellant, appellant cannot be heard to complain on appeal. (See 1 Hatcher's Kansas Digest [Rev. Ed.], Appeal and Error § 344.)

Yet another reason appears why it was not error for the trial court to refuse to direct verdicts in favor of the defendant on the issue of the contributory negligence of plaintiffs. Assuming, but not deciding, that the statute requires a gasoline transport driver to stop, look and listen before crossing each unmarked railroad track which serves the Fairfax industrial district of Kansas City, Kansas, contributory negligence does not automatically result from a failure to stop unless it is shown to be the direct and proximate cause of the accident. (*Newman v. Case*, 196 Kan. 689, Syl. ¶ 4, 413 P. 2d 1013.) Every negligence action is dependent on its own facts. (*Drake v. Moore*, 184 Kan. 309, 336 P. 2d 807.) The question of direct or proximate cause would still remain a decision for the jury. (*In re Estate of Lloyd*, 178 Kan. 572, 290 P. 2d 817.)

The district court did not err in refusing to direct verdicts in favor of the defendant.

One final point is raised by defendant. It concerns the admission

of testimony by three witnesses familiar with the crossing who testified the switch engine was customarily operated without using a flagman in the street, without lights and without warning signals as it crossed this street.

Evidence of habit or custom is relevant to an issue of behavior on a specified occasion, but is admissible on that issue only as tending to prove that the behavior on such occasion conformed to the habit or custom. (K. S. A. 60-449) Evidence of specific instances of behavior is admissible to prove habit or custom if the evidence is of a sufficient number of such instances to warrant a finding of such habit or custom. (K. S. A. 60-450) Any relevant evidence having a tendency in reason to prove any material fact is admissible unless expressly excluded from evidence by the codified rules. (See K. S. A. 60-401, et seq.) Admissibility of evidence is largely within the discretion of the trial judge subject to the exclusionary rules. No exclusionary rule has been called to our attention which would limit the wording of the above statutes. (K. S. A. 60-449 and 60-450)

One of the witnesses who testified had worked at the port of entry within a block and a half of the crossing for several years and had observed the operation of the switch engine in this area on numerous occasions each night. The other two witnesses were police officers who patrolled this area five or six times each night. All three of these witnesses had observed the operation of the switch engine over this crossing on previous occasions. It must be assumed the trial court determined the testimony showed a sufficient number of such instances to warrant a finding of habit or custom. No request was made under K. S. A. 60-406 to restrict the evidence to the issues for which it was authorized under K. S. A. 60-449 and 60-450. The evidence was properly admitted.

In addition the appellant objects to this evidence because it was not shown that the same four members of the crew were in control of the engine on the previous occasions testified to by these three witnesses.

The habit or custom is one which concerns the operation of switch engines by the Union Pacific Railroad Company. The railroad controls its switching operations by operating rules. It would contribute little to the determination of the custom of the railroad to require the names of the individuals who generally operated the engines. The testimony was to the effect that the engines were

uniformly observed in operation without lights, bell, whistle or flagman. It was the custom of the railroad and not of certain individual employees which was relevant to the issue.

We have examined the record on appeal and have considered each point raised. What has been said in the foregoing opinion disposes of all points on appeal. The judgments are affirmed.