No. 47,527

J. R. WAITS and JOAN FAY WAITS, FLOYD L. BEDIGREW and MRS. FLOYD L. BEDIGREW, *Appellees*, v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, *Appellant*.

(531 P. 2d 22)

Opinion filed January 25, 1975.

*Glenn D. Young, Jr.,* of Gott, Hope, Gott & Young, P. A., of Wichita, argued the cause, and *William A. Wells,* of the same firm, was with him on the brief for the appellant.

*Patrick F. Kelly,* of Render, Kamas and Kelly, of Wichita, argued the cause, and *Donald E. Lambdin,* of Coombs, Lambdin, Kluge and Garrity, Chartered, of Wichita, was with him on the brief for the appellees.

The opinion of the court was delivered by

SCHROEDER, J.: These are consolidated actions for wrongful death arising out of a collision between an automobile in which the plaintiffs' decedents were passengers and a freight train. The jury rendered a verdict in favor of the plaintiffs, and the railroad has duly perfected an appeal.

The principal points on appeal concern whether there was substantial competent evidence that the railroad crossing was unusually dangerous; whether the trial court erred in instructing that railroad crossbuck signs shall be erected on the right-hand side of each approach to the crossing; and whether the trial court erred in failing to rule as a matter of law on the issue of proximate cause.

The accident in question occurred on June 3, 1971, at the intersection of railroad tracks belonging to and maintained by St. Louis-San Francisco Railway Company (defendant-appellee, here-

inafter referred to as Frisco) and Greenwich Road, located north-east of Wichita, Kansas. The decedents, Debrah K. Waits and Franklin D. Bedigrew and three other persons were passengers in a 1967 Pontiac, owned and apparently driven by Randall L. Wells, and were proceeding north on Greenwich Road. At approximately 9:06 p. m. Central Daylight Savings Time, the Wells vehicle struck the side of an eastbound Frisco freight train (train No. 330) and all occupants of the automobile were killed. The point of impact was approximately 350 feet back of the lead engine at a coupling between the fourth and fifth freight cars. At the time of impact the emergency braking system of the train automatically became operative.

The evidence disclosed that Greenwich Road is a county road paved with blacktop which runs north and south and intersects Frisco's tracks at right angles. An entrance to Beech Aircraft property is located near the intersection in question. The posted speed limit at the time of the accident was 55 m. p. h. Both the tracks and the road are straight and level in the area of the crossing. The crossing is located just outside the city limits of Wichita to the northeast. The only warning sign maintained by Frisco at the crossing in question was a crossbuck located on the northwest corner of the intersection. The location of the crossbuck was such that it could not be seen by persons approaching from the south when a train was occupying the crossing. A standard yellow and black highway railroad crossing sign was located 475 feet south of the crossing on the right side of the road for traffic approaching the crossing. This sign was erected and maintained by the county road authority.

The conditions of light which existed at the time of the collision were disputed. Sunset occurred at 8:47 p. m. on June 3, 1971. Climatological records showed that at the time of the accident there was 80% cloud cover.

The patrolman of the Sedgwick County Sheriff's Department in charge of the investigation of the accident was J. B. Peters. Peters received a call concerning the accident at 9:12 p. m. when he was patrolling in a section of northeast Wichita. He immediately departed for the scene of the collision, and testified that he turned on his headlights because it was too dark to drive without them. Peters arrived at the scene at 9:19 p. m. and, according to him, visibility was such that lights were necessary. As to the visibility, Peters

further testified that under the light conditions as he recalled them, he could not see the train on the tracks from a distance of 500 feet. From a distance of 200 feet he could see the illuminated caboose which was on the west edge of the crossing, however, he did not think he would have been able to see the fourth or fifth freight cars because they were not illuminated.

Peters further testified that as one proceeds north on Greenwich Road at a point 556 feet south of the crossing there is a line of shrubbery and small trees running along private property adjacent to the road which obstructs vision to the northwest, and that at approximately 475 feet south of the crossing there were more shrubs and small trees, etc. The witness identified several photographs showing intermittent obstruction of vision to the northwest when one approaches the crossing. Peters' measurements indicated the Wells automobile laid down 110 feet of skid marks, and the remnants of the vehicle came to rest 130 feet off the edge of the roadway.

The Sedgwick County Sheriff, Johnnie Darr, arrived on the scene of the accident about 9:15 p. m. He testified the light conditions were bad that night and that it was a dark night. Darr further testified that a very short time after the June 3 accident under weather, shrubbery and lighting conditions the same as the night of the accident, he personally tested the visibility from a vehicle 470 feet south of the crossing when a Frisco train was passing on the crossing and that he could not see the train from that point, but that he could see the train from a distance of 200 feet with his bright headlights in use. According to the opinion of Darr with 110 feet of skid marks on the highway the driver of the vehicle started for the brakes 164 feet back of the crossing. He acknowledged that perception time precedes reaction time.

The Wichita City Traffic Engineer, Paul Graves, testified on behalf of the appellees. Graves stated that it is the responsibility of the railroads to place crossbuck signs, signals and gates at the crossings. The witness testified that in determining standards applicable to maintaining a crossing it is necessary to look to the Uniform Manual on Traffic Control Devices for Streets and Highways, which has been adopted in Kansas by the State Highway Commission. Graves read from a section of the manual which provides in substance that a crossbuck sign shall be erected on the right-hand side

of the roadway on each approach to the crossing, and that the sign shall be placed within a specified distance from the road.

At the appellees' request Mr. Graves investigated the Greenwich crossing. His observations were that there are no railroad crossing lights, flashing lights or street lights at the crossing and that as one travels north on Greenwich Road approaching the crossing there is a line of trees and shrubs which makes it impossible to see across the southwest quadrant of the crossing. He further stated that in determining the time and distance necessary for a person to stop one consideration is the perception time of the driver, that is, the time necessary to perceive danger before taking an action to begin braking. Furthermore, perception time is related to the placement of the warning or control device. The nature of the warning or control device and the amount of illumination of a crossing have a significant effect on a driver's perception. Assuming the Wells vehicle was traveling 55 m. p. h., Graves testified that 207 feet would be required for the driver to perceive danger and that another 180 feet on dry pavement would be necessary in order to react to the danger and stop the vehicle, making a total stopping time of 387 feet. The witness stated that under average nighttime conditions an average driver did not have adequate safe stopping sight distance at the Greenwich crossing. It was his opinion that Frisco had not maintained the standards of traffic safety at the Greenwich crossing as he understood them because there was not a crossbuck provided on the approach to the crossing from the south, and the crossbuck on the approach from the north was not reflectorized. Graves also recommended that flashing lights or some type of illumination be used at the crossing.

On cross-examination, Graves stated that the highway railroad crossing sign (located 475 feet south of the crossing next to the northbound lane) warns a motorist of a nearby railroad crossing, but does not indicate that a train is coming.

Mr. David Razak, a professional consulting engineer, also testified on behalf of the appellees. Based on his investigation of the accident, Razak concluded the Wells vehicle was traveling between 52 m. p. h. and 58 m. p. h. The total expected stopping distance of the Wells vehicle under conditions of a locked wheel skid is 205 feet. This figure presumes a three-fourths second reaction time. The witness stated that perception time was a factor in determining the amount of time necessary to stop the automobile on the night in question.

Razak calculated that the Frisco train entered the west side of the Greenwich crossing 6.82 seconds before the collision; and at the time the train entered the crossing the Wells vehicle was 518 feet south of the crossing.

The only other testimony introduced by the appellees was a deposition of George E. Warfel, the chief engineer for Frisco. Warfel was asked where he would place crossbucks at an intersection such as the one involved in the instant case, and he answered that one set of crossbucks would be required and the one for northbound traffic would be placed on the right side of the highway. Warfel subsequently stated:

"We try to put the crossbuck in such a position to conform with state laws and I am not familiar in detail with the state law of Kansas. Page M-1-2 of Standard Plans of Frisco Railroad Roadway Track and Structures, which is a manual published by the Frisco Railway Company, states that crossbucks should be placed at right angles to the highway.

"The railroad does not subscribe to the standards contained in the Uniform Traffic Control Devices for Streets and Highways, the reason for this being that we must place our crossbuck signs in accordance with state laws and these state laws vary from state to state.

"If the roadway we are talking about is for two lane traffic, I believe this requires only one crossbuck and in this case we might have it on the other side of the crossing, depending on which side of the crossing would give you the best view, which would be where we would get the best visibility."

At the close of the appellees' evidence, the appellant moved to dismiss the case and for summary judgment for the reason the appellees failed to prove by competent substantial evidence that the Greenwich crossing was unusually dangerous and obscure. The trial court's ruling on this motion was reserved, and the appellant proceeded with its evidence.

It is unnecessary for us to recite the appellant's evidence in any detail. Testimony was given on behalf of appellant by members of the crew working on the train involved in the accident to the effect that at the time of the collision it was still light and visibility was good. Various photographs purporting to depict the crossing under conditions as they existed on the night of the collision were also submitted into evidence.

Three engines were utilized to pull 46 cars. The engines were reddish-orange in color with white sides and yellow stripes in front. The headlights were burning, as they do day or night, and the engineer testified he sounded a whistle a quarter of a mile before reaching the crossing and continued to sound it until the front of

the engine was through the crossing. A bell on the engine was also ringing during the same time. The speed of the train as it approached and passed through the crossing was approximately 35 miles per hour.

The crew riding in the engine did not see the Wells vehicle approach the crossing and were not aware of the collision until notified of it by the conductor, who was riding in the caboose and who radioed the engineer, after the emergency brakes were activated.

Two of the Frisco employees working on train No. 330 rated the Greenwich crossing as "poor". Their reason for such a rating was because vision of the road from west of the crossing is obscured by shrubs, trees, buildings, etc.; however, they stated there was nothing to obstruct the view of a train in the crossing by a person approaching the intersection on Greenwich Road.

The Sedgwick County Engineer, Grover Cleveland McClure, testified on behalf of the appellant. He stated that at 10:00 p. m. on the evening following the collision between the Wells automobile and the train, he drove out to the Greenwich crossing when a train was crossing. He testified he was able to see the headlight of the engine when he was 1,000 feet south of the crossing. However, he knew the time the train was due to cross and was looking specifically for it.

Subsequently, in the course of his duties as county engineer, McClure had occasion to grade the Greenwich crossing. The criteria used for grading the crossing took into account the volume of highway traffic as compared to the number of trains and visual obstructions (which included shrubs in the northwest quadrant of this crossing as well as those in the southwest quadrant previously discussed). Considering these factors the witness rated the Greenwich crossing as "more dangerous than the normal crossing." He further said: "And also because of its rating we have requested that flashing lights be installed."

At the close of all the evidence the appellant moved for a directed verdict. The trial court overruled that motion, and the previous motion to dismiss, on the ground that there was substantial competent evidence from which the jury could base a finding that the Greenwich crossing was an unusually dangerous crossing.

Thereafter the jury returned a verdict in favor of the appellees. J. R. Waits and Joan Fay Waits were awarded damages in the

amount of $12,500, and a similar award was made in favor of Mr. and Mrs. Floyd L. Bedigrew. The appellant's motion for judgment notwithstanding the verdict was overruled and this appeal followed.

The appellant first contends the trial court erred in failing to rule as a matter of law that there was no substantial competent evidence introduced by the appellees to disclose that the Greenwich Road crossing in question was unusually dangerous.

Throughout the trial the appellees sought to prove that the Greenwich Road crossing was unusually dangerous and that the appellant failed to take additional precautions for the protection of travelers on the road which was the cause of death of the appellees' decedents.

Whether a railroad crossing is more than ordinarily dangerous is generally a question of fact, although the sufficiency of the evidence to establish that fact remains a question of law. (*Sexsmith v. Union Pacific Railroad Co.,* 209 Kan. 99, 495 P. 2d 930; and Jennings v. *Missouri Pacific Railroad Co.,* 211 Kan. 389, 506 P. 2d 1125.)

Where unusually dangerous conditions prevail at a railroad crossing the unusual hazard may make additional warnings and precautions by the railroad company necessary. (*Sexsmith v. Union Pacific Railroad Co.,* supra; and *Jennings v. Missouri Pacific Railroad Co.,* supra.)

No general rule of law is available from which the rights and liabilities growing out of all accidents occurring at railroad crossings may be determined. It necessarily results that each individual case must be determined on its particular conditions and circumstances. (*Drake v. Moore,* 184 Kan. 309, 315, 336 P. 2d 807; and *Grisamore, Administratix v. Atchison, T. & S. F. Rly. Co.,* 195 Kan. 16, 403 P. 2d 93.)

General rules for determining both the negligence of the railroad and the contributory negligence of the driver of the vehicle at a railroad crossing have been discussed in *Grisamore, Administratrix v. Atchison, T. & S. F. Rly Co.,* supra. The duty of a railroad to a motorist approaching a crossing is directly affected by the care required of the motorist. If the motorist would have been able to see the hazard, had he looked and been able to avoid the collision had his automobile been in proper condition and under proper control, the railroad has no obligation which could result in its negligence.

A railroad company need not anticipate that a motorist will be

negligent. If the conditions and circumstances are such that a motorist exercising due care in the operation of a properly equipped motor vehicle will see the train occupying a crossing in time to avoid an accident, the railroad may assume that the operator will do so, and it is not required to take precautions to avoid such a collision. The railroad has a right to make a reasonable use of a crossing, and ordinarily the presence of a train on the crossing is of itself an adequate warning to a driver of a vehicle on a highway and special safeguards need not be employed in the absence of unusual surroundings, conditions and circumstances. (*Grisamore, Administratrix v. Atchison, T. & S. F. Rly. Co.,* supra.)

Although railroads are not insurers of the safety of persons approaching their tracks for the purpose of crossing, they must exercise due care for the safety of travelers at public crossings. Unusually dangerous conditions prevailing at the crossing may require the railroad to anticipate that the mere presence of the train occupying the crossing will not adequately warn users of the highway. Such special conditions may create an unusual hazard making additional warnings necessary. (*Williams v. Union Pacific Railroad Co.,* 204 Kan. 772, 465 P. 2d 975; *Sexsmith v. Union Pacific Railroad Co.,* supra; and *Jennings v. Missouri Pacific Railroad Co.,* supra.)

Where a crossing is unusually dangerous such reasonable care must be exercised by the railroad as common prudence dictates. Under these circumstances where a train occupies a crossing the railroad is under a duty to use reasonable means to warn and avoid injury to the traveling public. The character of the means will depend on the particular conditions and circumstances surrounding the crossing. A railroad may be liable for injuries received by a motorist colliding with a railroad car on a crossing where normal headlights do not reveal the obstruction or where a trap is created by an illusion of safety revealed by the headlights. (*Grisamore, Administratrix v. Atchison, T. & S. F. Rly. Co.,* supra.)

The rule that motorist who drives into a railroad car standing or occupying a crossing, which is not unusually dangerous, is guilty of contributory negligence stems from an application of the rule that a driver of a motor vehicle must correlate his speed with his ability to stop within the range of his vision. (*Jones v. Atchison, T. & S. F. Rly. Co.,* 129 Kan. 314, 282 P. 2d 593; and *Sheets v. Baldwin,* 146 Kan. 596, 73 P. 2d 37.)

The rule as applied to railroad crossing accidents is subject to

qualifications and exceptions which are recognized in *Grisamore, Administratrix v. Atchison, T. & S. F. Rly. Co.,* supra, and cases cited therein.

Exceptions or qualifications to the rule, that a driver must correlate his speed with his ability to stop within the range of his vision, have been recognized by this court when the normal headlights of an automobile are absorbed by an unpainted, dark, drab color obstruction on the traveled portion of the roadway. In *Sponable v. Thomas,* 139 Kan. 710, 719, 33 P. 2d 721, there were no lights, either tail or other lights at the rear of a truck, nor any flares or other lights to warn of the truck's location on a highway. The lower portion of the back end of the truck was 47 or 48 inches above the ground, when the normal headlights of the automobile were only 36 inches above the ground. Under these circumstances the driver of the automobile was not held to be guilty of contributory negligence in colliding with the truck. In *Drake v. Moore,* 184 Kan. 309, 336 P. 2d 807, a driver on a highway on a dark, rainy night collided with the rear end of a semi-trailer and truck that stood squarely in the middle of the traffic lane in which he was driving. No lights were burning on the truck or trailer to warn oncoming motorists, and the rear end of the trailer was dull, drab and dirty in color, making it difficult to see at night. The trailer was so high above the pavement level that it was above the range of the driver's headlights. Under these circumstances the obstruction could not be seen until the driver was too close to avoid the collision. Under these conditions, and in view of the presumption that a decedent exercised due care for his own safety, it was held reasonable minds could differ on the question of whether the decedent was guilty of contributory negligence.

Courts have recognized that an illusion of safety is created where evidence presented shows that a dark railroad car on the crossing will absorb a considerable portion of the light rays of an automobile which strike it, and that a large portion of the rays which are actually reflected will travel in various directions, so that only a relatively small portion of the rays will register on the eyes of the motorist. (84 A. L. R. 2d 813, § 16, p. 840.)

The perceptibility of a train occupying a railroad crossing is an important element in the general rule which requires a motorist to observe the presence of a train occupying a railroad crossing as adequate notice or warning of its presence. In other words, the presence of a train on the crossing must in some measure be visible

and perceptible to serve adequate notice or warning of its presence. (*Petricek v. Elgin, J. & E. Ry Co.*, 21 Ill. App. 2d 60, 157 N. E. 2d 421 [1959].)

In *Atlantic Coast Line Railroad Company v. Kammerer*, 239 F. 2d 115 (5th Cir. 1956), the evidence showed that a train occupying an intersection could not be seen, and it was held the failure to erect a crossbuck sign was negligence which could be the proximate cause of an accident. (See also, *Boyd v. Illinois Cent. R. R. Co.*, 211 Miss. 409, 52 So. 2d 21 [1951].)

Many prior Kansas cases have distinguished between the duty owed by the railroads to warn travelers on the highway of approaching trains rightfully occupying the crossing. It has been said the purpose of crossing signs or signals is to warn of approaching trains and not of trains already occupying the crossing. (*Corkhill v. Thompson*, 169 Kan. 38, 217 P. 2d 273; and cases cited therein.) But this rule does not obtain where the railroad crossing is unusually dangerous, and the motorists' perceptibility of the train occupying the crossing is substantially impaired through no fault of their own. Under these circumstances the failure to erect a crossbuck sign, as here, on the right side of the motorists' approach to the crossing is evidence from which a jury could find negligence on the part of the railroad and that the negligence of the railroad in failing to erect the crossbuck sign was a proximate cause of the accident.

The foregoing cases are illustrative of situations the railroad must recognize in fulfilling its obligation to the traveling public where unusually dangerous conditions prevail at railroad crossings on public roads. The railroad is under a duty to give additional warnings of the presence of a train occupying a crossing where unusually dangerous conditions prevail at the crossing, and it should anticipate that the mere presence of the train on the crossing may not adequately warn users of the highway of the danger in time to avoid a collision. (*See, Palsgraf v. Long Island R. R. Co.*, 248 N. Y. 339, 162 N. E. 99, 59 A. L. R. 1253; and *Steele v. Rapp*, 183 Kan. 371, 327 P. 2d 1053, both court and dissenting opinions, for a discussion of negligence and the duty of care owed to others.)

Evidence before the trial court which tended to prove the unusually dangerous nature of the Greenwich Road crossing was substantial.

The collision occurred at 9:06 p. m. on the night of June 3, 1971, when the sun had set at 8:47 p. m. with an 80% overcast cloud cover in the sky. The night was described as a dark night and light-

ing conditions were bad. There were no railroad crossing lights, flashing lights or street lights at the crossing as one travels north on Greenwich Road approaching the crossing. Investigating officers who arrived within fifteen minutes after the accident had to drive to the scene of the accident with headlights on. Trees and shrubbery obscured vision to the northwest, the direction from which the train approached the crossing; and photographs taken when some light depicted the condition of the intersection with a train standing across Greenwich Road showed that trees in the northwest and northeast quadrants of the intersection silhouetted to blend in with and obscure the presence of the train across the intersection. When a train is occupying the crossing in question the single crossbuck sign maintained by the railroad at the northwest quadrant of the intersection as one approaches from the south cannot be seen. There was competent opinion testimony that a driver of an automobile approaching from the south on the night in question could not see a box car on the crossing from a distance of 200 feet, and giving due allowance for perception, reaction and braking time a driver traveling within the speed limit could not stop in time to avoid a collision with the train.

Upon reviewing the record we find there is substantial competent evidence to support the jury's finding that unusually dangerous conditions prevailed at the railroad crossing in question at the time of the accident, and the unusual hazard made additional warnings and precautions by the railroad company necessary. The presence of the train on the crossing did not adequately warn users of the highway.

The appellant contends the trial court erred in failing to rule as a matter of law that the proximate cause of the collision was the driving of the automobile into the side of the train.

If the appellant is attempting to say the trial court should have found as a matter of law that the driver of the automobile in question was negligent in its operation, and for that reason the appellees are barred from any recovery, it completely overlooks the Kansas law to the effect that the negligence of the driver of an automobile is not imputed to the passengers. (*Beye v. Andres,* 179 Kan. 502, 296 P. 2d 1049.)

Assuming the driver of the ill-fated car in question was negligent, the fact remains that the appellees are entitled to prove the concurrent negligence of the appellant. (*McRae, Adm'r v. Railroad Co.,* 116 Kan. 99, 225 Pac. 1032.)

Instructions of the trial court left to the jury the question of whether or not the driver of the car was negligent and, if he was, whether any negligence of the appellant which was a proximate cause of the collision concurred so as to cause the death of the appellees' decedents.

The appellant in its brief on this point reasserts its contention that the crossing in question was not unusually dangerous. Among the instructions given the jury was No. 12, which reads:

"If you find that the defendant maintained an unusually dangerous crossing and that it was negligent, you still must decide whether or not a cause of the accident was negligence of the defendant. In this regard, you should consider whether or not the presence of the train itself constituted an adequate warning. If it did, the crossing was not unusually dangerous."

The appellant's proximate cause argument is answered by the fact that the issue concerning the unusually dangerous nature of the crossing was properly submitted to the jury by the court's instructions. The jury determined this question adversely to the appellant.

The trial court refused to instruct the jury on contributory negligence on the ground there was no evidence whatever presented during the trial that the passengers were contributorily negligent. In doing so the trial court recognized a presumption favoring the deceased passengers. This court has long recognized that where a deceased person has lost his life in an accident it may be presumed, in the absence of evidence to the contrary, that he was at such time exercising due care for his own safety because of the love of life, which is normal to persons generally. (*Akin v. Estate of Hill,* 201 Kan. 306, 440 P. 2d 585; and *Hagood v. Hall,* 211 Kan. 46, 505 P. 2d 736). The record supports the trial court, and error asserted by the appellant on this point is without merit. Contributory negligence is never presumed, but must be established by proof. (*Hampton v. State Highway Commission,* 209 Kan. 565, 586, 498 P. 2d 236.)

The trial court by Instruction No. 11 instructed the jury that a violation of the law of Kansas constitutes negligence. In this connection the jury was instructed that Kansas law provides that railroad crossbuck signs "shall be erected on the right-hand side of the roadway on each approach to the crossing."

The appellant contends this instruction is erroneous and in essence is a ruling by the trial court that the railroad was negligent.

On January 1, 1966, Kansas Administrative Regulation 36-10-1 went into effect. It remained effective until January 1, 1973, and was in force on June 3, 1971, the date of the accident. The regula-

tion, authorized by K. S. A. 8-510 (repealed L. 1974, ch. 33, § 8-2205) provided for the adoption by the State Highway Commission of the "Manual on Uniform Traffic Control Devices for Streets and Highways". This manual is published by the U. S. Department of Commerce and the Bureau of Public Roads and is numbered D6.1-1961. (References to the manual herein will be to the subsequent publication, D6.1-1971.) Section 2B-42 of this manual is titled "Railroad Crossbuck Sign" and reads in part as follows:

"The crossbuck shall be white with the words RAILROAD CROSSING in black lettering. If there are two or more tracks, including sidings, the number of tracks shall be indicated on an auxiliary sign of inverted T shape mounted below the crossbuck. *The crossbuck shall be used at every railroad crossing,* alone or in combination with other protective devices.

"The design of the commonly used Railroad Crossbuck (R15-1) with auxiliary sign showing the number of tracks (R15-2), has been standardized by the Association of American Railroads.

"The crossbuck sign is usually furnished and installed by the railroad company and is usually located on the railroad right-of-way. The distance that should be assumed to separate tracks before an additional crossing sign is considered necessary is 100 feet, unless local conditions require otherwise. *The sign shall be erected on the right-hand side of the roadway on each approach to the crossing.*" (Emphasis added.)

The legislature has recently recognized the authority of this manual. In the 1974 Session Laws, ch. 33, § 8-2003, which replaces K. S. A. 8-510, the legislature expressly provides:

"Sec. 8-2003. The commission shall adopt a manual and specifications for a uniform system of traffic-control devices consistent with the provisions of this act for use upon highways within this state. Such uniform system shall correlate with and so far as possible conform to the system set forth in the most recent edition of the *manual on uniform traffic control devices for streets and highways* and other standards issued or endorsed by the federal highway administrator." (Emphasis added.)

In 1968 this court was called upon to interpret the force and effect of the provisions contained in the Manual on Uniform Traffic Control Devices for Streets and Highways in the case of *Brown v. State Highway Commission,* 202 Kan. 1, 444 P. 2d 882. There the plaintiff sought damages for the negligence of the state in failing to maintain one of its stop signs in compliance with the provisions of the "Manual on Uniform Traffic Control Devices for Streets and Highways". In affirming a judgment for the plaintiff the court there said:

"With the adoption of the Manual on Uniform Traffic Control Devices for Streets and Highways by the State Highway Commission pursuant to legislative

authorization, these regulations have the force and effect of law. . . ." (p. 15.)

The appellant contends, that although the manual may have the force and effect of law, it is applicable only to actions of the State Highway Commission and has no effect on the duty of the railroads regarding the erection and maintenance of warning signs and devices at their crossings.

The section of the manual heretofore quoted (2B-42) mandatorily directs that the sign shall be erected on the right-hand side of the roadway on each approach to the crossing. The same section expressly recognizes that the erection and maintenance of the cross-buck sign is usually furnished and installed by the railroad company and is usually located on the railroad right-of-way.

For the reasons hereafter stated we think it was the intent of the authorities to impose upon the railroad in this state the duty to safeguard their railroad crossings in accordance with section 2B-42 of the Manual on Uniform Traffic Control Devices for Streets and Highways which has the full force and effect of law.

K. S. A. 66-2,121 reads as follows:

"*Sign boards at crossings.* Every railway corporation shall cause *boards* to be placed, well supported by *posts* or otherwise, and constantly maintained across each traveled public road or street, when the same is crossed by the railway on the same level. Said *boards* shall be elevated so as not to obstruct the travel, and to be easily seen by travelers; and on each side of such *board* shall be painted in capital letters, 'Look out for the cars.' But this section shall not apply to streets in cities or towns, unless the corporation shall be required to put up such *boards* by the city or town authorities, or the officer having charge of such streets. [G. S. 1868, ch. 23, § 61; Oct. 31; R. S. 1923, 66-2,121.]" (Emphasis added.)

The foregoing statute was enacted in 1868 and has never been changed. It remains in force and effect today. From an analysis of the cases, this court has never been called upon to construe this statute on the point here in question.

When the legislature speaks of the railroads' duty to give warning, and when it specifies when and where such warning is necessary, the statute refers to the warning sign in the *plural.* However, when the statute sets out the words of warning required and the manner of their placement on the sign it reverts to use of the singular. Although the language employed in drafting the statute leaves much to be desired in the way of clarity, the logical conclusion to be drawn from the statute is that the legislature intended that *two sign boards be placed at railroad crossings* for the safety of travelers

on the highways. In *Heinen v. Atchison, T. & S. F. Rly. Co.,* 125 Kan. 612, 266 Pac. 35, it was held that the language of 66-2,121, *supra,* that required the maintenance of signs "across each traveled public road or street" did not mean that the signs had to be physically extended across the entire width of the road. In *Bledsoe v. M.-K.-T. Rld. Co.,* 149 Kan. 741, 90 P. 2d 9, the court specifically referred to the statute when it said:

". . . Defendant had the railroad crossing *signs* required by statute (G. S. 1935, 66-2,121) on each side of the crossing, and the state highway commission had erected the highway signs usual to indicate the approach to a railroad crossing." (p. 742.) (Emphasis added.)

The cases relied upon by the appellant (*Corkhill v. Thompson,* 169 Kan. 38, 217 P. 2d 273; and *Coleman v. St. Louis-S. F. Rly. Co.,* 130 Kan. 325, 286 Pac. 254), for the proposition that only one crossbuck is required by the statute, did not confront the court with an issue as to whether one or two crossbucks were required by the statute. Statements in these opinions tending to support the appellant's argument are at best dictum and we do not regard them as controlling.

Construing K. S. A. 66-2,121 and the Manual on Uniform Traffic Control Devices for Streets and Highways adopted by the State Highway Commission pursuant to K. S. A. 8-510 (first enacted by the legislature in 1937) together, the law of Kansas applicable at the time of this accident on June 3, 1971, imposed upon the railroad the duty to erect crossbuck signs on the right-hand side of the roadway on each approach to the crossing of a railroad track.

While the accident in the instant case occurred on a county road in Sedgwick County, Kansas, and not on a designated state highway of Kansas, the adoption by the State Highway Commission of the "Manual on Uniform Traffic Control Devices for Streets and Highways" imposes the obligation of uniformity set forth therein throughout the State of Kansas on its roads and highways. This is clarified by K. S. A. 8-507 which provides:

"The provisions of this act shall be applicable and uniform throughout this state and in all political subdivisions and municipalities therein, and no local authority shall enact or enforce any rule or regulation in conflict with the provisions of this act unless expressly authorized herein. Local authorities may, however, adopt additional traffic regulations which are not in conflict with the provisions of this act."

The foregoing statute is a part of the same act which contains 8-510, *supra,* authorizing the State Highway Commission to adopt a

manual and specifications for a uniform system of traffic control devices. The two sections of the act must be construed *in pari materia*.

The appellant relies upon K. S. A. 8-511 for the proposition that K. S. A. 8-510 was enacted by the legislature as a guide to the State Highway Commission in the placement of their own signs, and was never intended to grant the State Highway Commission authority to regulate railroads in placement of crossbucks. In 8-511, *supra*, the legislature gives general directions to the State Highway Commission to place and maintain traffic-control devices, conforming to its manual and specifications, upon all "State Highways". In section (*b*) the legislature prohibits local authorities from placing or maintaining any traffic-control device upon any highway under the jurisdiction of the State Highway Commission except by the latter's permission.

The general provisions of 8-511 do not control the specific provisions of K. S. A. 66-2,121 and K. S. A. 8-510, as heretofore construed. The legislature was concerned with the placement of general authority in the State Highway Commission for the placement and maintenance of traffic-control devices in 8-511.

At this point another statute deserves mention. K. S. A. 68-414 provides in part:

"When the state highway commission deems it advisable, said railroad company may be required by order of the state highway commission, to install and maintain suitable safety devices or warning signals at dangerous or obscure crossings to indicate the approach of trains."

The foregoing portion of the statute quoted is ambiguous. This court has heretofore distinguished between warnings required to indicate *the approach* of trains at railroad crossings with public highways, as distinguished from the presence of a train occupying a railroad crossing. This statute giving the highway commission authority to require suitable safety devices or warning signals at dangerous or obscure crossings seems to be limited to indicate only *the approach* of trains. Furthermore, this statute seems to be limited to action by the State Highway Commission regarding the "state highway system".

In any event, whether the railroad crossing on Greenwich Road in the instant case was an unusually dangerous crossing is a question of fact to be determined from the evidence. The failure of the State Highway Commission or local authorities to declare a rail-

road intersection to be an unusually dangerous crossing does not control the determination of this fact question. Language used by the court in *Corkill v. Thompson*, supra, in discussing the evidence should not be construed to the contrary.

For the reasons heretofore stated Instruction No. 11 given by the court to the jury was a correct statement of the law.

The judgment of the lower court is affirmed.

KAUL, J., dissenting: I cannot agree that the evidence in this case is sufficient to make a submissible question whether the crossing was more than ordinarily dangerous. This being the case, under the well-established rule (*Jennings v. Missouri Pacific Railroad Co.*, 211 Kan. 389, 506 P. 2d 1125; and *Sexsmith v. Union Pacific Railroad Co.*, 209 Kan. 99, 495 P. 2d 930), the trial court erred in failing to determine the question as a matter of law and directing a verdict for defendant.