No. 53,097

TERESA L. SCHMECK, *Appellee,* v. CITY OF SHAWNEE, KANSAS, a municipal corporation; SECRETARY OF TRANSPORTATION OF KANSAS; KANSAS CITY POWER & LIGHT COMPANY, a corporation; MARILYN I. VELASQUEZ, Administratrix of the Estate of Linda S. Nepote, Deceased, *Appellants.*

(651 P.2d 585)

**12**

Opinion filed September 17, 1982.

*J. Eugene Balloun,* of Balloun & Bodinson, Chartered, of Olathe, argued the cause and *Ron Bodinson* and *Thomas R. Buchanan,* of the same firm, and *Marvin E. Rainey,* of Rainey & Wiglesworth, of Overland Park, were with him on the brief for appellant City of Shawnee.

*J. Roy Holliday, Jr.,* of Speer, Austin, Holliday, Lane & Ruddick, Chartered, of Olathe, argued the cause, and *Peter V. Ruddick* and *Mary L. Stuckey,* of the same firm, were with him on the brief for appellant Kansas City Power & Light Company.

*Donald S. Simons,* of Topeka, argued the cause and was on the brief for appellant Secretary of Transportation of Kansas.

*Victor A. Bergman,* of Schnider, Shamberg & May, of Shawnee Mission, argued the cause, and *John E. Shamberg* and *Mark A. Johnson,* of the same firm, were with him on the brief for appellee.

*Frank A. Bien* and *Barkley Clark,* of the League of Kansas Municipalities, of Topeka, and *John Dekker,* director of law of the city of Wichita, and *Phillip L. Harris,* city attorney of Overland Park, were on the *amicus curiae* brief of the League of Kansas Municipalities.

The opinion of the court was delivered by

HERD, J.: This is an appeal by the City of Shawnee (City), and Kansas City Power and Light Company (KCPL), from a jury verdict for Teresa Schmeck in the amount of $1,750,000. The action arose out of a motorcycle accident on July 11, 1976. The City was found to be 47.5% at fault and KCPL was found to be 22.5% at fault. Larry Doyle, who settled with Schmeck prior to trial, was found to be 30% at fault. The remaining defendants, Kansas Department of Transportation (KDOT) and the Estate of Linda Nepote, deceased, were found to have no fault.

On July 11, 1976, at approximately 10:30 p.m., Teresa Schmeck was riding on a motorcycle driven by Linda Nepote. They were proceeding east in the outside lane of highway K-10 in the City of

Shawnee. At the same time Larry Doyle was proceeding west on K-10. At the intersection of K-10 and Quivira Road, Doyle pulled to the protected left-turn bay, then entered the intersection on the green light in an attempt to make a left turn south onto Quivira Road. While Doyle was in the intersection, a car driven by Robert Pastorious approached the intersection from the west then turned right on Quivira. Doyle then started to complete his left turn believing the highway was clear of oncoming traffic. As he did so, his vehicle was struck on the right front side by the Nepote motorcycle. The two cyclists were thrown over the hood of the Doyle car landing over fifty feet from the point of impact. Linda Nepote was killed and Teresa Schmeck suffered head injuries resulting in permanent partial loss of memory, permanent eye and brain damage and paralysis of her right side. The only witnesses to the collision were Larry Doyle, Robert Pastorious and a James Schumaker. They testified the road conditions were normal that night. Traffic was light. Doyle was under no impairment or disability at the time, and his view to the west on K-10 was unobstructed. In spite of this, Doyle did not see the motorcycle headlight and pulled directly into its path as it proceeded through the intersection on a green light. There was no left-turn signal at the intersection at that time.

Since the traffic control system at the intersection of 63rd Street, K-10 and Quivira Road is crucial to this lawsuit, let us review its history. The intersection lies in the city limits of Shawnee. 63rd Street is a "connecting link" on highway K-10. K.S.A. 1981 Supp. 68-406 defines "connecting link" as a city street which "[c]onnects a state highway through a city."

In 1968 highway K-10 was a two lane street in Shawnee controlled by four-way stop signs at the K-10 - Quivira Road intersection. K-10 was widened to four lanes in 1969. At that time, automatic traffic signals were installed with an extended mast arm on K-10 so that a separate left-turn signal could be added later.

KDOT, the City and KCPL were all involved in the decisions regarding the traffic control devices at the K-10 - Quivira Road intersection. Let us examine their roles. Traffic control devices on connecting links are either owned or leased by the City. The City is obligated to maintain the devices and monitor the traffic to detect changes in conditions which warrant a change in control.

The City is charged with originating all changes in signal systems. K.S.A. 8-2005 requires connecting link cities to "place and maintain such traffic-control devices . . . . [s]ubject to the direction and control of the secretary of transportation" through permits. A city must obtain a permit before it can change traffic-control on a connecting link. KDOT follows the requirements of the Manual on Uniform Traffic Control Devices (MUTCD) in issuing permits. In addition to directing and controlling the traffic control devices on connecting links, KDOT also provides the cities, upon request, with technical assistance in the form of traffic engineering studies and recommendations.

The State is obligated to pay the connecting link cities a fixed sum of money "per lane mile" per year for maintenance or the city may at its option elect to have the State maintain the connecting link. Shawnee exercised this option and entered into a connecting link maintenance agreement with KDOT. The 1970 and 1975 agreements define the obligation thereunder "to maintain" as including "Lighting and Traffic Control Signals: All lighting systems, traffic signals, restrictive and/or regulatory signs." It was established by parol evidence that on all connecting links the city is responsible for maintaining traffic signals, regardless of which option is exercised. Shawnee leased its automatic traffic signals from KCPL.

The traffic signal system in place at the K-10 - Quivira Road intersection on July 11, 1976, was installed in 1969, as the result of a compromise agreement between the City, KDOT and KCPL. The City had requested left-turn signals which KDOT rejected. The installed system contained semi-traffic actuated signals only, with an extended mast arm for the future addition of a separate left-turn signal. This signal system was devised to accommodate intersections through which the traffic flow was unequal. Here most of the traffic was on K-10 so the signal on K-10 would remain green until the detectors on Quivira Road signaled traffic there. The light would then change for a short time to relieve the Quivira Road congestion then return the green light to K-10.

There are two other types of traffic signal systems. The most common and least costly is the fixed-time system which permits traffic flow for a pre-set period of time. This system can have a multi-dial controller which permits variation of the fixed time period to accommodate rush hour traffic demands and comes

equipped with or without left-turn signals. The other type of automated signal system is the fully automated traffic actuated system. It is the most complex and expensive of the systems. Left-turn signals are optional with it.

Since KDOT rejected left-turn signals in 1969 and provided only for an extended mast arm to contain a future signal, the installation of a fully automated traffic actuated system with left-turn capabilities would entail an outlay of about $3,000.

In 1974 the City and Johnson County commenced a joint project to widen Quivira Road to four lanes north from 75th Street to Johnson Drive. The project was completed in 1976 at a total cost of $1,210,892.32. On April 17, 1975, Dennis Kallsen, Shawnee city manager, requested KCPL to relocate the traffic signals at the intersection of K-10 and Quivira Road as a part of the street widening project. KCPL responded on April 25, 1975, with a price quotation for the relocation. Kallsen then sent the following letter to KCPL on April 29, 1975:

"I would appreciate receiving a proposal for updating this equipment to handle those situations that normally occur on minor arterial streets. In the past, Quivira Road has acted as a collector street but with the widening to four lanes we envision it to become a minor arterial and some serious consideration should be given to providing left hand turn signals with appropriate mast arms. *I certainly am no expert in traffic engineering and would appreciate your review of the situation. I am certain, however, that provision for left hand turns at 63rd and Quivira will be needed immediately upon completion of the street."* (Emphasis added.)

KCPL understood the letter to be a request to make a traffic study and prepare a proposal.

KCPL accepted the obligation of designing the proper traffic signal system for the K-10 - Quivira Road intersection and assigned the task to its "system planner," Don Jones, who had the total design responsibility. The City had no staff expertise regarding traffic signal systems. Since KCPL engaged in the business of constructing, leasing and maintaining traffic signal systems for profit the City depended on relevant information provided by KCPL. Consequently, the City assumed Don Jones was a traffic engineer when, in fact, he was a high school graduate with no training in traffic engineering. Jones commenced his work on the design by inspecting the intersection, counting traffic lanes and measuring their width. He started on the design of the new signal system on April 28, 1975. On May 22,

1975, the plan and blueprints were completed. Jones' plan called for a fixed-time controller with protected left-hand turns off both streets, despite his knowledge the system had been semi-traffic actuated since 1969 with 70% of the traffic on K-10. KCPL's plan was submitted to KDOT for approval on July 17, 1975. On August 11, 1975, KDOT rejected the plan and returned it for revision because the fixed-time controller was deemed inappropriate for an intersection with such a traffic imbalance.

The City through Kallsen then wrote KCPL and requested that

"[Y]our engineering people design an installation on the basis of installing a semi-traffic actuated signal . . . which is evidently the type of design desired by the State. . . .

"As you are probably aware, the construction of Quivira Road from 75th Street to Johnson Drive is presently ahead of schedule and I would appreciate every effort to have the design of the above referenced to the State so we could have it installed by the end of the construction."

Nothing further developed regarding the design of a traffic control system until October 7, 1975. A conference between the City and KDOT was held to facilitate the installation of the signals by the time the street improvement was completed, which was imminent.

On October 8, 1975, the city again wrote KCPL:

"Please consider this letter the City of Shawnee's request for Kansas City Power and Light to design a signal installation for the intersection of Quivira Road and K-10. Mr. Jones of your firm and our staff met yesterday with representatives of the highway department to discuss the proposed installation. Enclosed you will find the state's recommendation regarding this installation and the City is agreeable to installing the type of installation as recommended by the state."

KDOT's recommendation called for protected left-hand turns off K-10 with "dashed-in" indicators for future protected left-hand turns off Quivira Road. The KDOT plan also called for a "five-phase expandable controller," to accommodate three additional phases needed for the future plan for Quivira Road. KCPL's planner, Don Jones, did not fully understand what was meant by "expandable." He submitted his next design plan on November 5, 1975, omitting the word "expandable" from the description of the controller. There was then a four-month delay before Jones completed his plan on March 4, 1976, adding the expandability feature to the controller. The supplier estimated the delivery time on the system to be ten to twelve weeks from April 12, 1976, when KCPL told the City it would be ordered. How-

ever, it was not ordered until July 13, 1976, and the installation not completed until March 24, 1977.

I

Against this factual background Teresa Schmeck brought an action alleging the City breached its duty (1) to keep the intersection in a condition reasonably safe for its intended use; and (2) to maintain the traffic signals at the intersection in accordance with the MUTCD. The City's defense was governmental immunity. It argued the decision whether to install a left turn signal at the intersection was an act of governmental discretion and the city was therefore immune from liability. The City's position was first urged in its motion for summary judgment, which was overruled. The case was then submitted to the jury on the fact issue of whether the City negligently failed to maintain the intersection in a condition reasonably safe for its intended use. The verdict and judgment against the City resulted.

Let us examine the question of governmental immunity. It is important to bear in mind there is a marked distinction in this state between the liability of a city and that of the state, county or township. Historically cities were governed by the common law; state highways by K.S.A. 68-419 (Corrick); and counties and townships by K.S.A. 68-301 (Corrick). The enactment of the Kansas Tort Claims Act (K.S.A. 75-6101 *et seq.*), effective July 1, 1979, changed the previous law and provided that all governmental entities could incur liability pursuant to its terms. However, we are not concerned with the Tort Claims Act since it had no retroactive application and this cause of action arose July 11, 1976.

One of the earliest cases enunciating the rule that it is the common-law duty of a city to keep its streets reasonably safe for use in the usual mode by travelers was *Jansen v. City of Atchison,* 16 Kan. 358, Syl. ¶ 1 (1876). *Jansen* was followed by *Gould v. City of Topeka,* 32 Kan. 485, 4 Pac. 822 (1884). *Gould* involved a claim for personal injuries suffered by Luella Gould when the carriage in which she was riding overturned, throwing her down a high and narrow embankment which was unprotected by railing or barriers and not lighted at night. In overturning a verdict in favor of the defendant city, the court set out the following rules:

"A city is liable for any injury to private individuals caused by the negligence of its officers in not keeping its streets in a safe and proper condition."

"And a city has no more right to plan or create an unsafe and dangerous condition of one of its streets than it has to plan or create a public or common nuisance."

"The control of the public streets of a city is vested in the city, and its exercise by the city is not wholly discretionary, or judicial, or quasi-judicial, or legislative, and is not divided or shared with any other corporation, or board, or tribunal, but is absolute and exclusive in the city itself, and it is not conferred upon the city merely as a benefit which it may exercise, or not, at its option or discretion, but it is imposed upon the city also as an absolute and mandatory duty, which it has no right to evade or avoid. Generally, cities must keep their streets in safe and proper condition at their peril." 32 Kan. 485, Syl. ¶¶ 1, 2 and 3.

Other cases following the same rule are: *Grantham v. City of Topeka,* 196 Kan. 393, Syl. ¶ 1, 411 P.2d 634 (1966); *Klipp v. City of Hoyt,* 99 Kan. 14, 16, 160 Pac. 1000 (1916); *Holitza v. Kansas City,* 68 Kan. 157, 74 Pac. 594 (1903); *Burns v. Emporia,* 63 Kan. 285, 287, 65 Pac. 260 (1901); and *Johnson v. Haupt,* 5 Kan. App. 2d 682, 684, 623 P.2d 537 (1981).

Of the foregoing cases, the most significant is *Grantham.* There the plaintiff was injured when her car collided with another at the intersection of Tyler and Huntoon in Topeka. Both streets were one-way streets; Tyler was controlled by a stationary stop sign with a one-way street sign affixed requiring northbound Tyler traffic to stop before entering the intersection.

The day prior to the plaintiff's accident, there had been another accident at this intersection in which the combination stop and one-way street sign was hit and bent over so it could not be seen by the northbound driver on Tyler. The police had investigated the prior accident, thus establishing notice to the city of the defective street sign for a period of twenty hours before plaintiff's accident.

The issue before the court was whether a knocked down or bent over stationary stop and one-way street sign, installed by the city, constituted a defect under Kansas law. In holding that it did, the court set out the following general rules at pages 397-98:

"It is a general rule of law in this state that a municipality is not liable for negligent acts of its officers or employees in the performance of a governmental function unless such liability is expressly imposed by law. [Citations omitted.] The rule is based on the doctrine that the state is not liable except as made so by statute and that municipalities, when acting in a governmental capacity, are arms of the state. [Citations omitted.] However, exceptions have been engrafted into this general rule by decisions of this court to the effect that a municipality is liable (1) where its conduct results in creating or maintaining a nuisance [citations omitted], and (2) for its negligent and wrongful acts (a) when performing in a

proprietary capacity [citations omitted], and (b) for failure to keep its streets reasonably safe for public use. With respect to the latter, the general rule relating to public streets is stated in *Perry v. City of Wichita*, [174 Kan. 264, 255 P.2d 667 (1953)] as follows:

"' . . . An exception to the general rule also has been recognized with respect to defects in public streets on the theory they are necessary for the public use at all times and under all conditions. [Citations omitted.]'

"The standard fixed by law concerning a city's duty to maintain its streets may be stated thusly: A city rests under the positive legal duty to keep its streets in a condition reasonably safe for their intended use, and it is liable in a civil action for injuries resulting from neglect to perform this duty. Streets must be such that the traveling public may use them and be reasonably secure. The decisions of this court illustrating the foregoing rule are legion . . . ."

The court noted no statute imposed "liability upon a municipality for injuries resulting from defects in a public street," but rather this liability of municipalities had "been judicially established in a long and consistent line of decisions." 196 Kan. at 397.

In *Carroll v. Kittle*, 203 Kan. 841, Syl. ¶ 3, 457 P.2d 21 (1969), the Kansas Supreme Court abolished governmental immunity for torts when the State or its governmental agencies were engaged in proprietary activities. The legislature immediately reinstated governmental immunity by enacting K.S.A. 46-901 (Weeks) and 46-902 (Weeks) (now repealed). The court upheld the legislative choice to reinstate governmental immunity in *Woods v. Kansas Turnpike Authority*, 205 Kan. 770, 773, 472 P.2d 219 (1970), and cases which followed.

Finally, in 1975, the court held K.S.A. 46-901 and 46-902 unconstitutional in *Brown v. Wichita State University*, 217 Kan. 279, 540 P.2d 66 (1975) (*Brown I*). *Brown I* was rapidly reversed and governmental immunity restored in *Brown v. Wichita State University*, 219 Kan. 2, 547 P.2d 1015 (1976) (*Brown II*). However, it is important to note that governmental immunity, as defined by K.S.A. 46-901 and 46-902, applied only to the State and its subdivisions, not to cities.

Therefore, cities remained covered by the law set out in *Brown I*:

"A city is liable for tortious conduct when engaged in proprietary activities, but enjoys immunity while engaged in governmental activities except for the creation and maintenance of a nuisance and the failure to keep streets reasonably safe." 217 Kan. at 296.

In *Gorrell v. City of Parsons*, 223 Kan. 645, 576 P.2d 616 (1978), this court abolished governmental immunity of a city for

the negligent acts of its officers or employees in the performance of a governmental function. Municipal immunity was limited to "acts and omissions constituting the exercise of a legislative or judicial function, or constituting the exercise of an administrative function involving the making of a basic policy decision." The court went on to note that this rule "places municipalities, for the most part, on an equal footing with individuals and corporate entities so far as responsibility for injuries or damage caused by negligence is concerned." 223 Kan. at 650.

The holding in *Gorrell* was made applicable "to all similar cases filed before or after April 1, 1978, regardless of when the causes of action accrued except where a final judgment or verdict has been entered." *Thome v. City of Newton,* 229 Kan. 375, 380, 624 P.2d 454 (1981). *Thome* was handed down February 28, 1981. The verdict in the Schmeck case was filed February 18, 1981. Therefore, *Gorrell* does not apply.

Following *Gorrell,* the legislature amended K.S.A. 46-902, placing a one-year moratorium on the effect of *Gorrell.* Thus, from May 16, 1978, to July 1, 1979, immunity was restored for cities, *except* as to nuisance actions, statutorily-defined actions and actions based upon negligent failure to correct defects in streets. K.S.A. 1978 Supp. 46-902.

Because the accident involved in the case before us occurred in July, 1976, K.S.A. 1978 Supp. 46-902 *does not apply*. Further, it is important to note that the street defect exception to immunity was statutorily recognized by the legislature in that enactment.

The law in effect in July 1976, as it related to municipalities, was set out in *Brown I*: A city is immune from liability for governmental activities *except for the failure to keep streets reasonably safe.* 217 Kan. at 296. We hold an action for common-law negligence against the City for failure to keep its streets reasonably safe was available to Schmeck.

The City argues its actions were discretionary, thus absolving it from any liability for Schmeck's injuries. Let us examine the case law in that regard.

In *Jansen v. City of Atchison,* 16 Kan. 358 (1876), a sidewalk broke through and the plaintiff was injured when he fell beneath it. The City argued that the control and care a city exercises over its streets and sidewalks are by virtue of a power of governmental character, and that it was not liable to the private action of an

individual for neglecting to exercise such power, or for its imperfect execution. In rejecting the city's argument, the court stated:

"The first proposition is one very sweeping in its reach, and if true gives to cities an immunity from responsibility which to most would seem not only novel, but dangerous." 16 Kan. at 380.

The same argument was made and rejected in *Gould v. City of Topeka*, 32 Kan. at 492, where, as noted above, the court stated the "control of the streets" was "not wholly discretionary" and was put into the cities' hands "as an absolute and mandatory duty, which they have no right to evade, or avoid."

Finally, in *Grantham* the City argued that the maintenance of stop and one-way street signs was an aspect of traffic regulation falling within the sphere of those activities to which governmental immunity applies. In answer, the court held:

"This court had never held that municipalities are insurers for the traveling public, but it is well settled they have a positive legal duty to keep their streets in a condition reasonably safe and convenient for the traveling public *and they have no right or discretion to evade or avoid that duty.*" 196 Kan. at 403. (Emphasis added.)

The foregoing cases clearly show a city's common-law duty to keep its streets reasonably safe cannot be avoided by alleging the acts were discretionary. The City's claim is without merit.

The City next argues Schmeck's allegations of negligence do not state a cause of action for defective streets as a matter of law.

In the present case, the appellee framed her cause of action based upon the common-law negligence theory. In the pretrial order, her cause of action against the City was stated as follows:

"1. Negligent failure to keep the K-10 and Quivira Road intersection and approaching roads from the east and west in a condition reasonably safe for their intended use . . . ."

She then went on to allege specific instances of negligence including, but not limited to:

"(a) Failure to recognize, from 1971 forward, that protected left-hand turns . . . were needed to make the intersection reasonably safe for its intended use.

"(b) Failure to maintain a warning for east and westbound traffic of unexpected conflicts of east and westbound traffic.

. . . .

"(d) Failure to provide a warning to left turning traffic that the maneuver was not protected and/or that there was fast approaching traffic east and westbound.

"(e) Failure to maintain traffic control signals at the intersection of K-10 and Quivira Road between March of 1969 and July 11, 1976 pursuant to the standards set forth in the Manual on Uniform Traffic Control Devices . . . ."

This court has held that whether or not a particular condition is a street defect depends upon the facts and conditions of the individual case. *Grantham v. City of Topeka,* 196 Kan. at 399; *McCollister v. City of Wichita,* 180 Kan. 401, 404, 304 P.2d 543 (1956).

Several cases have defined street defects in order to aid the trier of fact in determining whether a defect exists. In *Loftin v. City of Kansas City,* 164 Kan. 412, 415, 190 P.2d 378 (1948), the court defined a defect in the street as "*a condition or object therein which makes the street unsafe and dangerous for travel and use and is the legal cause of the injury of which complaint is made.*" See also *Grantham,* 196 Kan. at 399, where the court added further to this definition by stating:

"It is not necessary that a defective condition be in the surface of the roadway; that is, in the pavement or the curb and gutter. If the condition is such that it affects the street to the extent that it is not reasonably safe for its intended use, a defective street condition exists."

It is clear, then, that the definition of a "street defect" is quite broad. It is also apparent that what constitutes a street defect is ordinarily a question for the jury. *Grantham,* 196 Kan. at 402-03. As such the City's claim is without merit.

The City relies on many Kansas cases which were decided under the highway defect statutes, K.S.A. 68-301 and 68-419 (Corrick) (both repealed effective July 1, 1979). Among these are *Schaeffer v. Kansas Dept. of Transportation,* 227 Kan. 509, 608 P.2d 1309 (1980) (K.S.A. 68-419 - curve warning sign); *Martin v. State Highway Commission,* 213 Kan. 877, 518 P.2d 437 (1974) (K.S.A. 68-419 - no guardrail for bridge pillar); *Coffman v. Fisher,* 203 Kan. 618, 455 P.2d 490 (1969) (K.S.A. 68-301 - stop sign knocked down); *Brown v. State Highway Commission,* 202 Kan. 1, 444 P.2d 882 (1968) (K.S.A. 68-419 - stop sign obstructed from view by growth of vegetation); *Phillips v. State Highway Comm.,* 148 Kan. 702, 84 P.2d 927 (1938) (K.S.A. 68-419 - stop sign hidden by dense growth of weeds); and *Carder v. Grandview Township,* 2 Kan. App. 2d 7, 573 P.2d 1121 (1978) (K.S.A. 68-301 - no warning signs at T-intersection).

All the foregoing cases are distinguishable from the present

case. They were brought under the defect statutes which apply a different standard of liability. The basic rule which evolves from those cases is that the failure to place (or replace) a guardrail, stop sign, traffic light, speed limit sign, etc., does not constitute a defect unless there is a statutory duty to erect such a sign, guardrail, etc. As we previously stated, these statutes apply only to the state, counties and townships.

To analyze the distinguishing characteristics between statutory highway defect cases and cases brought against cities for common law negligence in keeping the streets reasonably safe, let us make a comparison of *Grantham* and *Coffman.* In both cases, a stop sign was knocked down. In *Grantham,* the stop sign was knocked down in a prior accident at the same intersection. It had only been down for some twenty hours before the plaintiff was involved in an accident. In *Coffman* a construction crew knocked the stop sign down, and it was down for several months before the plaintiff's accident. In *Grantham* the court said that whether or not a particular condition "is a street defect depends upon the facts" of the individual case. 196 Kan. at 399. In *Coffman* the court stated that "whether an alleged defect comes within the purview of the statute [K.S.A. 68-301] is a question of law to be determined by the statute in the absence of any factual dispute as to the nature of the alleged defect." 203 Kan. 618, Syl. ¶ 1. Thus, under the statute, the determination of a defect is a question of law, while under the common law it is a question of fact.

Yet another difference between the two cases is the issue of negligence. In *Grantham* common-law negligence theories were applied. In *Coffman* the court stated that K.S.A. 68-301 does not impose liability for general negligence but creates instead strictly a statutory liability for defects.

Based on the two divergent standards, different results were reached. In *Coffman,* where the stop sign had been missing from the intersection for several months, the court found there was no defect under K.S.A. 68-301. In *Grantham,* where the city stop sign was missing for around twenty hours, the court held, "[t]hat the sign was defective is evident . . . ." 196 Kan. at 402. The cause was then remanded for trial.

Thus we conclude the standard of liability and its application are totally different under these two lines of cases. The City's case citations pertaining to statutory defects do not apply to this case.

The pleadings, pretrial order and instructions properly framed the issues in this case. Schmeck claimed the City's failure to maintain a traffic turn signal at K-10 and Quivira Road was a breach of its duty to keep the intersection in a reasonably safe condition. The City was not immune from liability for its conduct. Whether the City was actually negligent was a question of fact for the jury. The case was submitted to the jury with proper instructions on those issues. The jury's verdict will not be disturbed on appellate review if supported by the evidence. The verdict was so supported. We will examine the alleged trial errors later in this opinion.

## II

Let us now consider the issues raised by Kansas City Power and Light Company. KCPL first argues it owed no duty to users of the intersection of K-10 and Quivira Road.

The facts clearly indicate KCPL undertook the duty to render traffic engineering services to the City. Consequently, Schmeck relies on Restatement (Second) of Torts § 324A (1965), which provides:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

"(a) his failure to exercise reasonable care increases the risk of such harm, or

"(b) he has undertaken to perform a duty owed by the other to the third person, or

"(c) the harm is suffered because of reliance of the other or the third person upon the undertaking."

The court submitted this theory of liability to the jury in its Instruction 16, stating in part:

"If you find that the Kansas City Power & Light Co. rendered services to the City of Shawnee which it should have recognized were necessary for the protection of others, then it had a duty to exercise reasonable care in providing these services.

"If you find that in rendering services to the City of Shawnee, Kansas City Power & Light Company undertook to act as a professional traffic engineer, then in deciding if it exercised reasonable care in performing those services you should measure Kansas City Power & Light Company's conduct by the standards of reasonable care for professional traffic engineers.

"With regard to the facts of this case, if you find each of the following from the evidence then you must find for the Plaintiff and assess some degree of fault against the Kansas City Power & Light Company.

"(1) That Kansas City Power & Light Company undertook to design a traffic signal system for the intersection of 63rd Street and Quivira Road.

"(2) That in doing so Kansas City Power & Light Company recognized or should have recognized that these traffic signals were necessary for the protection of the traveling public.

"(3) That it failed to exercise reasonable care in the process of designing the signal system, and

"(4) That such failure caused or contributed to cause Plaintiff's injuries and damages."

The court then recited the specific acts of KCPL which Schmeck claimed amounted to negligence. The jury found KCPL negligent and 22.5% at fault.

KCPL's argument that it owed no duty to the appellee is built upon three points: (1) Its only obligation was contractual and having contracted with the City, no duty was created for the benefit of the plaintiff; (2) a contractor owes no duty to the general public for legal nonfeasance or failure to act; and (3) plaintiff's recovery must be based on some sort of negligent breach of contract by KCPL.

The first point is based on a third-party beneficiary concept. KCPL urges this case is based on contract, that KCPL did not breach the contract and that Schmeck was not in privity with KCPL. It is important to note appellee's cause of action against KCPL was not based on contract. Rather, it was founded on the alleged negligence of KCPL. Therefore, the arguments regarding third-party beneficiaries and privity are irrelevant. No theory of contract was asserted or tried in the court below.

The second point likewise has no application to this case. KCPL bases this claim on its assertion "[p]laintiff presented no evidence . . . that the work performed by KCP&L was negligent or that KCP&L was . . . guilty of misfeasance." KCPL further contends that Schmeck's cause of action against KCPL was based on its failure to act, which amounts to nonfeasance.

Prosser, Law of Torts § 93 (4th ed. 1971), states misfeasance occurs when "there has been something in the nature of entering upon performance, such as a partial inspection, or making an initial one, so that a duty has been assumed by conduct . . . ." p. 625. Clearly Schmeck's cause of action against KCPL is based on the active negligence of KCPL in undertaking the design of the traffic control system at the intersection of K-10 and Quivira Road and performing that job in a

negligent manner. As such KCPL's alleged actions fall squarely within the definition of misfeasance.

KCPL's third point is that appellee's recovery has to be based on some sort of negligent breach of contract by KCPL. Again, KCPL is misconstruing the cause of action brought by Schmeck by treating the case as if it were based upon the contractual relationship between KCPL and the City. Although KCPL and the City did have a contract, Schmeck did not attack it or allege it served as the basis for a duty owed to her. Rather, Schmeck alleged KCPL went beyond its contractual obligations and engaged in the business of providing services to the City as a traffic engineering consultant by agreeing to study the traffic signal needs at the intersection and to formulate a proposal for meeting the requirements of the State and MUTCD. Thus, KCPL assumed part of the City's duty to keep its streets reasonably safe for their intended use.

Schmeck argues KCPL's assumption of this duty permits the application of Restatement (Second) of Torts § 324A(b) and (c) (1965), to the company's conduct. First it should be noted the principles embodied in § 324A have long been recognized by this court. The earliest case is *Jenree v. Street Railway Co.,* 86 Kan. 479, 121 Pac. 510 (1912). There, a railway company contracted with the City to maintain and repair a viaduct. A sidewalk on the viaduct fell into disrepair, and plaintiff was injured as a result. The plaintiff sued the railway company, basing her cause of action in negligence. The obligations assumed by the railway pursuant to its agreement with the City were the basis of plaintiff's claim that the railway owed her a duty. The court expressed the principle that one who undertakes a duty normally owed by a city to the public has effectively undertaken a "public duty" and is liable for injuries to members of the public caused by neglect in performing the duty. The court went on to recognize the element of reliance by the City on the railroad when it stated:

"The city was not engaging a contractor or employing an agent or servant to perform for it and on its behalf the work of inspection, repair, reconstruction and the like, essential to the maintenance of a secure way. It was taking advantage of an opportunity to shift the whole burden of taking those steps upon another who should stand, in relation to the public safety and convenience, in the city's place and stead. The obligation being a public one, to be performed for the public benefit, the party assuming it was responsible to the public. Therefore, the contract was one for the benefit of the plaintiff as a member of the public." 86 Kan. at 482-83.

However, the court noted at page 486 that even though the contractor had undertaken the City's responsibility, the City's liability remained uncancelled to be *shared* by the railway company and the City.

In *Robinson v. Nightingale,* 188 Kan. 377, 362 P.2d 432 (1961), the court recognized public policy considerations impose a duty upon parties to private contracts, running to third persons, where negligence in performance creates a danger to the general public. At page 383, the court stated:

"While the contract or contracts here involved were the private agreements of the defendants, nonetheless if Simlo were negligent in performing its part of the contract so that a dangerous structure was in fact erected, having knowledge as it must have had that the hoist would be used by the general public, it would be liable to an injured third person such as the plaintiff if its negligence were the direct and proximate cause of the injury, or if in fact it were a joint tort-feasor with other defendants. Under such circumstances, the source of liability is placed in the law based upon public policy."

KCPL's response to *Robinson* was that although the case "admittedly suggests the general Restatement proposition cited [§ 324A], it falls quite short of extending responsibility to a contractor for not yet doing the work."

KCPL's argument is without merit. KCPL was performing the planning of the intersection and, thus, *was* actually engaged in "doing the work." There was no error in the trial court's application, through instruction No. 16, of § 324A of the Restatement to the facts of this case.

Finally, KCPL contends there was no causal connection between the acts of KCPL and the appellee's injuries. It argues the negligence of Larry Doyle, the driver of the automobile involved in the accident, was an intervening act which proximately caused Schmeck's injuries, thus relieving KCPL of liability.

First, the cases cited by KCPL are inapplicable here. They involve a party's failure to obey a traffic signal. Such is not the situation in the instant case. Larry Doyle had the green light. There was no allegation or evidence he ran a caution or red light.

Second, we have held negligence, contributory negligence and proximate cause are all issues to be determined by the jury. *Popejoy Construction Co. v. Crist,* 214 Kan. 704, Syl. ¶ 1, 522 P.2d 180 (1974); *Portwood v. City of Leavenworth,* 6 Kan. App. 2d 498, 502, 630 P.2d 162 (1981).

In *George v. Breising,* 206 Kan. 221, 227, 477 P.2d 983 (1970), the court discussed intervening causation:

"Whether the negligent conduct of the original wrongdoer is to be insulated as a matter of law by the intervening negligent act of another is determined by the test of foreseeability. If the original actor should have reasonably foreseen and anticipated the intervening act causing injury in the light of the attendant circumstances, his act of negligence would be a proximate cause of the injury. Foreseeability of some injury from an act or omission is a prerequisite to its being a proximate cause of the injury for which recovery is sought. When negligence appears merely to have brought about a condition of affairs or a situation in which another and entirely independent and efficient agency intervenes to cause the injury, the latter is to be deemed the direct and proximate cause and the former only the indirect or remote cause."

An analogous case is *Waits v. St. Louis-San Francisco Rly. Co.,* 216 Kan. 160, 531 P.2d 22 (1975). There, plaintiff's decedents were killed when a train struck the car in which they were passengers. The defendant railroad argued that the negligence of the driver should have been found to be the sole proximate cause of the collision. The court rejected the defendant's argument, stating at 171-72:

"Assuming the driver of the ill-fated car in question was negligent, the fact remains that the appellees are entitled to prove the concurrent negligence of the appellant. [Citation omitted.]

"Instructions of the trial court left to the jury the question of whether or not the driver of the car was negligent and, if he was, whether any negligence of the appellant which was a proximate cause of the collision concurred so as to cause the death of the appellees' decedents."

An examination of the record reveals that the jury's determination of proximate cause was supported by the evidence. In addition, the trial court gave instructions which left the question of Larry Doyle's negligence to the jury. They found him concurrently negligent with KCPL and the City. No error is shown.

### III

Let us now briefly consider the trial errors asserted by appellants. They first contend the trial court's failure to allow the appellants more than three peremptory jury challenges was reversible error. K.S.A. 60-247(c) states:

"In civil cases, each party shall be entitled to three (3) peremptory challenges, except as provided in subsection (h) of section 60-248, as amended, pertaining to alternate jurors. Multiple defendants or multiple plaintiffs shall be considered as a single party for the purpose of making challenges except that if the judge finds there is a good faith controversy existing between multiple plaintiffs or multiple

defendants, the court in its discretion and in the interest of justice, may allow any of the parties, single or multiple, additional peremptory challenges and permit them to be exercised separately or jointly."

Here the appellants adopted a united position and maintained that position throughout the trial. The trial court accordingly found no good faith controversy existed among the appellants and allocated them three peremptory challenges. The evidence supports this conclusion.

Appellants next object to the admission of reports of other vehicle accidents which occurred at the K-10 - Quivira Road intersection before and after the left-turn signals were installed. The City made no contemporaneous objection to their admission. KCPL objected to the reports at trial. On appeal it narrowed its objection to "unreported" accidents. The accidents were, however, reported to the City and the reports were verified City records. As such no error is shown.

Further, the reports were relevant to the issues in this case. In *Hampton v. State Highway Commission,* 209 Kan. 565, 575, 498 P.2d 236 (1972), we stated:

"Defendant objected to the admission of evidence of other accidents and general traffic conditions in the area. We think such testimony was relevant not only to the existence of the alleged defect but on the issue of notice, . . . ."

See also *Schaeffer v. Kansas Dept. of Transportation,* 227 Kan. 509, 517, 608 P.2d 1309 (1980).

Here the accident reports were relevant in determining whether the City was maintaining an unreasonably dangerous intersection and whether it had notice of the defect. They were also relevant to Schmeck's claim the City was negligent in failing to conduct traffic studies at the intersection. We conclude no error was committed in admission of the accident reports.

KCPL next argues the admission of evidence regarding the date the new signalization equipment was ordered, July 13, 1976, and the date it was finally installed, March 24, 1977, was error in violation of K.S.A. 60-451.

K.S.A. 60-451 prohibits the introduction of subsequent remedial conduct by providing:

"When after the occurrence of an event remedial or precautionary measures are taken, which, if taken previously would have tended to make the event less likely to occur, evidence of such subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event."

This statute has been cited repeatedly by this court for the proposition that evidence of subsequent remedial measures may not be introduced to show negligence or culpable conduct. *Thierer v. Board of County Commissioners,* 212 Kan. 571, 575, 512 P.2d 343 (1973); *Huxol v. Nickell,* 205 Kan. 718, 722, 473 P.2d 90 (1970).

In explaining its reasons for admitting the evidence, the trial court stated:

"There were objections made by both the City and the Kansas City Power and Light that this was remedial conduct, and, therefore, should not be allowed in the evidence, but I think if you'll look at the case law and the *Huxol v. Nickell,* 205 Kan. 718 case especially deals with remedial conduct, and while the Court really has a problem with even finding the installation of traffic control devices was remedial conduct because it was conduct that had been predetermined to be placed at that intersection, many, many months prior to this accident, but remedial conduct, if it is, in fact, remedial conduct, can be introduced to show a condition that existed. It is improper to introduce remedial conduct for the apportionment of liability or fault, and if the parties recall, there was a limiting instruction by this Court that they could not use anything that happened after the date of the accident for the apportionment of fault, and there's nothing to indicate that the jury, in any - - did anything, but follow the Court's instructions."

The point the trial court was making was that the parties merely *completed* something which had been *started* long before the plaintiff's accident. Thus, this evidence could not be characterized as subsequent *remedial* conduct.

Even if the conduct is considered remedial the evidence was admissible to show control. See *Huxol v. Nickell,* 205 Kan. at 723. Clearly, in this case, the question of who had control of the intersection was in dispute. The State said the City had control; the City and KCPL pointed their fingers in unison at the State; Schmeck showed both the City and KCPL were exerting control over the planning and design with supervision of KDOT. In short, control was a major issue. The admission of the order date and the installation date shed light on who was controlling the planning and design of the intersection.

We find no error in admission of evidence of installation of the left-turn signals.

A number of lay witnesses testified, expressing their opinions as to the safety of this intersection. The City and KCPL argue this was error because the lay witnesses were not experts on matters of intersections and signalization.

K.S.A. 60-456(*a*) provides:

"If the witness is not testifying as an expert his or her testimony in the form of opinions or inferences is limited to such opinions or inferences as the judge finds (a) may be rationally based on the perception of the witness and (b) are helpful to a clearer understanding of his or her testimony."

Whether a witness is qualified to testify as to his opinion is to be determined by the trial court in the exercise of its discretion. The exercise of that discretion is not subject to review except in cases of abuse. *Hampton v. State Highway Commission,* 209 Kan. 565, Syl. ¶ 10, 498 P.2d 236 (1972). This court has held that lay witness opinions are admissible even though they embrace ultimate issues. *Noland v. Sears, Roebuck & Co.,* 207 Kan. 72, 483 P.2d 1029 (1971). The weight to be given to lay opinion testimony, as well as the weight to be accorded expert testimony, is for the jury to determine. *State v. Shultz,* 225 Kan. 135, 137, 587 P.2d 901 (1978).

A review of the opinion testimony at issue here reveals it was all based upon the witnesses' abilities to observe as they used the intersection. Their opinions as to the safety of the intersection were based on personal experience and were properly admitted. The trial court did not abuse its discretion in admitting lay witness testimony.

The City argues it was error to give the following instruction:

"The City of Shawnee had a positive legal duty to keep the intersection of 63rd Street and Quivira Road in a condition reasonably safe for its intended use. A city may not delegate to an independent contractor its primary legal responsibility to keep its streets in a reasonably safe condition for their intended use.

"The streets must be such that the traveling public may use them and be reasonably safe and secure. In determining whether the intersection was reasonably safe and secure, you may consider the condition of the traffic signals.

"If you find that on July 11, 1976, the City of Shawnee failed in its duty to keep the intersection of 63rd Street and Quivira Road in a condition reasonably safe for its intended use, and you find that this condition caused or contributed to cause Plaintiff's injuries and damages, then you must find for the Plaintiff and against the City of Shawnee."

The City argues this instruction is erroneous in light of *Brown v. Keill,* 224 Kan. 195, 580 P.2d 867 (1978), which held the adoption of the comparative negligence statute, K.S.A. 60-258a, abolished joint and several liability. The City argues since it could not be held jointly and severally liable, it was error to instruct the jury the City had a nondelegable duty.

The City's argument is without merit. In *Britt v. Allen County Community Jr. College,* 230 Kan. 502, 505, 638 P.2d 914 (1982),

we held the enactment of the comparative negligence statute did not affect or change the basic duty a landowner or possessor of premises owed to those patrons entering the premises. An analogous holding was expressed by the Court of Appeals in *Taplin v. Clark,* 6 Kan. App. 2d 66, 69, 626 P.2d 1198 (1981), where the court concluded the comparative negligence statute did not change the basic duties required of drivers and passengers in automobile tort litigation. Similarly, we hold the enactment of K.S.A. 60-258a did not change the basic duty of a city to keep its streets in reasonably safe condition.

KCPL next argues appellee's exhibit No. 14, an enlarged nighttime photograph of the intersection, was unfairly prejudicial and should not have been admitted.

Except as otherwise provided by statute or the constitution, all relevant evidence is admissible. K.S.A. 60-407(f). Any evidence which has a tendency in reason to establish a material fact is relevant and may be admitted into evidence. *Dawson v. Associates Financial Services Co.,* 215 Kan. 814, Syl. ¶ 3, 529 P.2d 104 (1974). In light of the expert testimony of appellee's witness regarding motorcycle headlights, the fact that there were street lights at the intersection was material. Since the photographs showed those street lights, it was obviously relevant in proving a material fact.

A trial judge may exclude otherwise relevant evidence when its probative value is substantially outweighed by the risk of unfair prejudice. K.S.A. 60-445. Under this statute, the trial court is given wide discretion on the admission or exclusion of evidence. *Schaeffer v. Kansas Dept. of Transportation,* 227 Kan. at 518. Thus, unless appellant can show the photograph was so prejudicial that its admission amounted to an abuse of discretion, there was no reversible error. An abuse of discretion exists only when no reasonable person could take the view adopted by the trial court. *In re Pennington,* 224 Kan. 573, Syl. ¶ 3, 581 P.2d 812 (1978), *cert. denied* 440 U.S. 929 (1979).

Here there was no abuse of discretion. The jury was repeatedly reminded the actual scene was not as dark as that depicted in the photograph. Even if the jury were under the impression the intersection was actually that dark, Schmeck's case would not have benefited. Schmeck's argument was that bright lights made it difficult to detect a motorcycle headlight, not that a dark

intersection somehow contributed to the accident. No error is shown.

KCPL complains the trial court erroneously admitted minutes from a meeting of the Shawnee City Council held May 19, 1970. At that meeting Mr. Lambeth, the consulting engineer for the City, offered his assessment of the traffic signal situation at K-10 - Quivira Road. His opinion was that a left-turn signal at this intersection would be beneficial. According to Mr. Lambeth the cause of a recent accident at the intersection was the malfunction of the controller.

KCPL complains Mr. Lambeth's comments should have been excised from the minutes before they were introduced because his assertions were incorrect and prejudicial. First, contrary to KCPL's assertion, the parties never agreed that Mr. Lambeth's comment was a misstatement of fact. Second, appellant has not shown how the inclusion of the comments was prejudicial. Schmeck's theory was never that the controller malfunctioned. Rather, it was that the City was negligent in failing to maintain the intersection in a reasonably safe condition. For this purpose, the city council minutes were relevant and admissible.

KCPL next objects to testimony by two of Schmeck's expert witnesses regarding the lighting conditions surrounding the intersection where the accident occurred. There is no question these witnesses qualified as experts under K.S.A. 60-456(b). The record reveals their special knowledge, skill, training, and experience. Their testimony was also based on facts personally perceived by them. Contrary to KCPL's contention, this testimony did not make the street lighting itself an issue. Appellee's case always rested on the argument the City was negligent in failing to keep the intersection reasonably safe for its intended use. The testimony was offered to show the lighting was one of the circumstances which gave rise to the need to install a left-turn signal.

KCPL also complains that Schmeck's exhibit No. 44A was improperly admitted. The exhibit consists of a letter responding to a resident's request for a left-turn signal at the intersection. In response, the City's Community Director informed the resident the necessary equipment had been on order from KCPL for over a year and that it should be installed "in a few weeks" after January 12, 1977.

KCPL argues the statement in the letter is self-serving. That may be true. Because our state has no rule of evidence excluding self-serving statements per se, however, the letter cannot be held inadmissible on that basis. *Thompson v. Norman,* 198 Kan. 436, Syl. ¶ 3, 424 P.2d 593 (1967). Self-serving statements may sometimes be inadmissible as hearsay. Here, however, the letter was offered not to prove the truth of its assertions, but to show the City's awareness of the problem.

KCPL argues that the admission of evidence regarding traffic counts was "unfairly prejudicial" because the counts were taken at peak hours, and the accident occurred later in the evening when there was less traffic at the intersection. No support is offered for this claim and understandably so. The counts were used to show another factor which justified installation of the left-turn signal. Nothing in the evidence would have led the jury to believe the accident occurred during a peak traffic count. Indeed, it was emphasized the counts were taken at peak hours, while the collision occurred at night. No prejudice was shown.

KCPL argues that the trial court erred in excluding: (1) evidence of drugs at the accident scene; and (2) evidence of appellee's prior drug use.

The drugs found at the accident scene consisted of caffeine tablets and a small quantity of marijuana taken from Teresa Schmeck's purse. The trial court was correct in excluding this evidence. In the first place, Teresa Schmeck was not the *driver* of the motorcycle, so it is difficult to see what difference it would make even if she had used drugs. There was no evidence in the record that either she or the driver, Linda Nepote, had consumed any alcohol or drugs that evening. In fact, quite the opposite is the case. Robert Chadwick, Linda Nepote's boyfriend, was with Ms. Schmeck and Ms. Nepote right before the accident. He testified that no alcohol or drugs were consumed by either Schmeck or Nepote the night of the accident. This testimony went uncontradicted.

Further, the chance of prejudicing the jury far outweighed any probative value which might have resulted from the admission of the evidence. The trial court's discretion regarding admission of evidence was not abused. See *Schaeffer v. Kansas Dept. of Transportation,* 227 Kan. at 518.

As to the evidence of prior drug use of Teresa Schmeck, KCPL

argued at trial it was relevant to show the basis for the opinion of Dr. Modlin, a psychiatrist called by the appellee. An offer of proof was made in which the defense attorneys all cross-examined Dr. Modlin. However, Dr. Modlin's testimony did not support KCPL's theory that Ms. Schmeck's brain damage and depression were caused by prior drug use.

Now on appeal, KCPL argues this evidence should have been admitted as relevant to the issues of lost wages and life expectancy. This is the first time it has argued the point. Not a single question was directed to Dr. Modlin during the proffer regarding the effect of drug addiction on life expectancy, nor were lost wages ever addressed in this regard. Since KCPL did not adopt or argue this position at trial, the company cannot now assert it. See *Anderson v. Overland Park Credit Union,* 231 Kan. 97, 107, 643 P.2d 120 (1982). The trial court's exclusion of the evidence was correct.

We have carefully considered all of appellants' other issues of error and though not specifically commented on herein, we find them without merit.

The judgment of the trial court is affirmed.

FROMME, J., dissenting. This action against the City of Shawnee arose prior to the enactment of the Kansas Tort Claims Act. See K.S.A. 1981 Supp. 75-6101 *et seq.* Therefore, the common law duty of the City to keep streets in a reasonably safe condition was the applicable law imposed. Supporting citations on this duty of the City appear in the opinion for the court and I join in holding that a submissible case was made against the City of Shawnee.

However, I find myself unable to agree with the majority that a submissible case was made against the Kansas City Power & Light Company (KCPL). KCPL owed no duty to the plaintiff which it breached and no breach of such an alleged duty could have been the proximate cause of plaintiff's injuries and damage. It is basic tort law that before a defendant can be held liable to the plaintiff there must be a duty owed. KCPL's only obligation regarding signalization of the K-10 and Quivira intersection was contractual and was to the City. The tort claim of plaintiff against the City would not extend to KCPL. There was no privity between plaintiff and KCPL; there was no misfeasance by KCPL; and KCPL did not breach its contractual obligation with the City.

It is true that the City advised KCPL that it wanted the new

signalization engineered and installed when the Quivira four lane road was opened, but no exact date could be given for that happening and no agreement was executed imposing such a contractual deadline on KCPL.

KCPL contracted to prepare the signalization, and thus became bound by that contract to the City for any breach or failure to perform. No obligation was created or imposed for the benefit of the plaintiff by KCPL's failure to perform. At the time of this unfortunate two-vehicle accident the roadway and signalization were free of defects which could have caused the accident. The red traffic lights were properly activated and were readily visible to anyone using Quivira Road. The green traffic lights were properly activated and were readily visible to anyone traveling on K-10 Highway. The accident was caused by the actions of Larry Doyle who made a left turn onto Quivira Road in the face of oncoming traffic.

We must assume from the jury verdict this was an unreasonably dangerous intersection. However, it was the responsibility of the City of Shawnee, and the City's duty to the traveling public with regard to this condition cannot be delegated to another. K.S.A. 8-2005 charges municipalities with the responsibility for placing and maintaining traffic control devices to regulate, warn, or guide traffic. In exercising these functions the City cannot, as a matter of law, delegate that responsibility and accompanying liability to KCPL. *Landau v. City of Leawood,* 214 Kan. 104, 519 P.2d 676 (1974); *Coffman v. Fisher,* 203 Kan. 618, 624, 455 P.2d 490 (1969).

When a contractor undertakes performance of a contract and performs in such a manner as to create an inherent danger resulting in injury, liability may be established. *Talley v. Skelly Oil Co.,* 199 Kan. 767, 777, 433 P.2d 425 (1967). However, no evidence was introduced to indicate any misfeasance by KCPL with regard to the intersection and its signalization. The intersection and signalization had not been changed by KCPL for no work on the signals was undertaken until after the accident. It is generally held that a contractor owes no duty to the general public for nonfeasance, *i.e.,* failure to do anything.

As stated in 1 C.J.S., Actions § 49 c, p. 1112:

"The mere negligent breach or nonperformance of a contract will not sustain an action sounding in tort, in the absence of a liability imposed by law independent

of that arising out of the contract itself, only an action ex contractu being available. . . . However, active negligence or misfeasance is necessary to support an action in tort based on a breach of contract; *mere nonfeasance, even if it amounts to a willful neglect to perform the contract, is not sufficient."* Emphasis supplied.

The distinction is hardly a new one. The United States Supreme Court in the case of *Atlantic and Pacific Railroad v. Laird,* 164 U.S. 393, 399, 41 L.Ed. 485, 17 S.Ct. 120 (1896), in quoting from *Kelly v. Metropolitan Railway Company,* 1 Q.B. 944 (1895), stated:

"The distinction is this—if the cause of complaint be for an act of omission or nonfeasance which, without proof of a contract to do what has been left undone, would not give rise to any cause of action (because no duty apart from contract to do what is complained of exists) then the action is founded upon contract and not upon tort."

Active negligence or misfeasance is necessary to support an action in tort based on breach of contract; mere nonfeasance, even if it amounts to a willful neglect to perform the contract, is not sufficient. Here, there has been no allegation that the contract itself was breached at all.

What is the application of this limitation where, as here, it is a third party who is damaged? Prosser provides the answer:

"The refusal to find any liability to third persons has been most definite where the defendant's misconduct is found to have consisted merely of a failure to perform the contract at all. Such 'nonfeasance' ordinarily leads to no tort liability even to the promisee, whose remedy must be on the contract itself; and it follows that a third person, no party to the contract, has no better claim in tort. Thus it is quite generally agreed that if the defendant contracts to accept employment with A, in work which will affect the safety of B, and then entirely fails to appear for work and never enters upon the employment, he may be liable to A for breach of his contract, but he will have no liability in contract or in tort to B." Prosser, Law of Torts (4th ed. 1971), § 93, p. 623.

Plaintiff urged the application of Restatement (Second) of Torts § 324A (1965):

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

"(a) his failure to exercise reasonable care increases the risk of such harm, or

"(b) he has undertaken to perform a duty owed by the other to the third person, or

"(c) the harm is suffered because of reliance of the other or the third person upon the undertaking."

However, attention should be directed to the "Caveat" included by the American Law Institute immediately following the quoted Restatement section:

"Caveat:
    "The Institute expresses no opinion as to whether:
    "(1) the making of a contract or a gratuitous promise, *without in any way entering upon performance,* is a sufficient undertaking to result in liability under the rule stated in this Section." Emphasis supplied.

Where no left-turn signal existed, and where there is no complaint about the effective operation of existing signals or other work actually performed by the KCPL, there can be no liability on the part of the contractor, even if the contract had been breached.

Whether plaintiff proceeded under contract or negligence theories, KCPL owed no obligation to signalize the intersection independent of a contract with the City. Any theory of negligence must have been based upon a duty arising out of contract, and no liability under contract *or* negligence attaches where there is no breach of the contract in the first place. It is elemental that negligence does not operate in a vacuum. In order for negligence to be actionable, there must exist a duty owed to the plaintiff. *George v. Breising,* 206 Kan. 221, 225, 477 P.2d 983 (1970); *Dye v. Rule,* 138 Kan. 808, Syl. ¶ 2, 28 P.2d 758 (1934).

Here, the only possible nexus between the plaintiff and KCPL was the contract wherein KCPL agreed to install left-turn signals at the intersection pursuant to the specifications of the City as approved by the Kansas Department of Transportation. There was no allegation that the contract was breached. Evidence adduced at trial was that KCPL had until August 24, 1976 (more than six weeks after plaintiff's accident) to complete the left-turn signal installation.

If it is the delay in installation that is considered actionable negligence, then others who contributed to this delay must be considered guilty of actionable negligence. After the signalization plan had been finalized and approved by both the City and the KDOT, approval by KDOT being required by K.S.A. 8-2005(b), the first controller system ordered and received by KCPL was defective when received from the manufacturer. The delay in signalization due to this defective controller system was not

chargeable to KCPL. Mere delay or nonfeasance should not subject KCPL to tort liability in this case.

Accordingly, the trial court erred when it failed to sustain KCPL's motions for a directed verdict and for judgment notwithstanding the verdict, and I would reverse the judgment.